Eugene Y. Turin (SB # 342413)
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002 Ex. 3
Fax: 312-275-7895
eturin@mcgpc.com

*Counsel for Plaintiffs and the Putative Class Members*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GRANT GIBSON, TINA GIBSON and BRIAN GIBSON, individually and on behalf of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>ADVANCED BIONICS, LLC, a Delaware limited liability company,<br><br>Defendant. | Case No. 2:25-cv-00423-MCS-SSC<br><br>The Honorable Mark C. Scarsi<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**1. Fraudulent Concealment.**<br>**2. Fraud.**<br>**3. Breach of Express Warranty.**<br>**4. Breach of Implied Warranty.**<br>**5. Breach of Contract.**<br><br>DEMAND FOR JURY TRIAL |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, GRANT GIBSON (“Grant”), TINA GIBSON (“Tina”) and BRIAN GIBSON (“Brian”) (Grant, Tina and Brian are also collectively referred to as “Plaintiffs”) bring this First Amended Class Action Complaint against Defendant, ADVANCED BIONICS, LLC, a Delaware limited liability company (“AB” or “Defendant”). Plaintiffs allege as follows based on personal knowledge as to themselves and their own acts and experiences and as to all other matters, on information and belief, including an investigation by their attorneys.

## NATURE OF THE CASE

1. This is a class action suit brought by Plaintiffs on their own behalf and on behalf of other similarly situated individuals for the unlawful, deceptive, and misleading business practices, or more simply put, fraud engaged in by Defendant, a manufacturer and seller of cochlear implant ("CI") medical devices and sound processors.

2. Plaintiffs seek to represent a Class of individuals who purchased AB's Harmony, Neptune, and/or Naida sound processors, respectively (these Harmony, Neptune, and/or Naida sound processors are each individually referred to herein as a "Processor" and collectively referred to herein as "the Processors").

3. As more fully set forth herein, AB tested the Processors under conditions that it manipulated to fraudulently achieve passing radio frequency ("RF") test results. As a result, the Processors are adulterated, misbranded and have zero commercial value because it was illegal for AB to sell them to consumers, including Plaintiffs and the Class.

4. Also as more fully set forth herein, Plaintiffs and the Class suffered economic damages recoverable under state law because they paid for devices that were not lawfully marketable by AB, lacked the FDA-compliant features promised by AB, and, had the truth been disclosed by AB, could not and would not have been purchased.

5. This action asserts parallel state law claims that do not impose requirements "different from or in addition to" federal law. Rather, Plaintiffs and the Class seek relief for AB's independent violations of state fraud laws, warranty rights, and contract.

6. A CI is an active prosthetic device that is surgically implanted in the cochlea of a person who has severe hearing impairment. It works by converting sound waves into electrical signals that are sent directly to the auditory nerve, bypassing the

damaged parts of the ear and allowing the person to hear again.

7. The overall CI system requires an external unit in order to function as intended. This external unit is referred to as the "processor," and it is made up of a digital signal processing ("DSP") unit and an RF transmitter.

8. The CI has an RF receiver and a hermetically sealed stimulator, both of which are powered from the RF signal that originates from the RF transmitter in the processor.

9. Processors consist of a microphone, which picks up sounds from the environment, a signal processor, which converts the sounds into digital signals, and a transmitter, which wirelessly sends the digital signals through the recipient's skin to the surgically implanted CI. Processors are typically worn behind the ear.

10. The CI consists of an electrode array, which is a series of fine wires that are implanted into the cochlea, and a receiver-stimulator, a small device that is implanted under the skin near the ear. The receiver-stimulator receives the digital signals from the transmitter and converts them into electrical signals that are sent to the electrode array. The electrode array then stimulates the auditory nerve, which sends the signals to the brain to be interpreted as sound.

11. The RF signal is used to transmit the data and is converted by the CI to electric currents, which are then delivered to electrodes placed in the cochlea to stimulate auditory signals.

12. The RF signal also provides power to the receiver-stimulator.

13. Thus, the RF component provides both the signal that transmits sound from the processor to the CI and the power that creates the electric current used to stimulate the auditory nerve fibers.

14. Because they are medical devices and emitters of RF energy, CIs and Processors are subject to laws and regulations intended to protect the public from harmful RF interference and other risks to health and safety. These include, but are

not limited to the Federal Food, Drug, and Cosmetic Act ("FDCA") as amended by the Medical Device Amendments of 1976, the Safe Medical Device Act of 1990, and the Food and Drug Administration Modernization Act of 1997.

15. Although stringent testing procedures are required to ensure that devices are compliant, the conditions under which the tests are performed can be fraudulently manipulated to provide passing results when a processor otherwise would have failed. For example, "CISPR-11" testing, a testing scheme carefully designed to ensure that devices do not emit harmful RF interference, can be manipulated by testing the subject device in best-case conditions instead of required testing conditions.

16. As more fully set forth herein, AB intentionally manipulated the conditions under which Processors were RF tested and obtained passing test results through fraudulent means. AB then provided these fraudulent test results to the FDA and other entities to obtain regulatory approval for its devices in order to sell them to Plaintiffs and the putative Class members.

17. AB's fraudulent test results also led consumers, including Plaintiffs and the putative Class members, to believe that AB's Processors were safe, compatible with other devices that emit and/or receive radio-frequency energy, and that they were suitable for their intended use.

18. Contrary to this belief, however, AB had "gamed" the testing procedures by manipulating them in a manner to ensure that the Processors would achieve passing results, when they would have otherwise failed testing absent the fraud outlined herein.

19. Consequently, AB's customers were misled into purchasing its Processors under a false pretense, such that Plaintiffs Tina, Brian and the putative Class members would not have purchased Defendant's Processors or compatible CIs.

20. Plaintiffs bring this class action lawsuit on behalf of themselves and all other similarly situated individuals and seek damages, restitution, declaratory and

injunctive relief.

21. Plaintiffs bring this class action lawsuit based on Defendant's failure to comply with the Premarket Approval, federal law and federal regulations subjecting Defendant to liability for Plaintiffs' parallel state law claims set forth herein.

22. Plaintiffs' claims do not seek to impose requirements beyond those established by the FDA. Rather, Plaintiffs allege that Defendant's conduct independently violated state law duties, including California's fraud laws, by marketing and selling devices under materially false pretenses regarding RF compliance and safety. Such claims exist independent of any FDA enforcement action and are not preempted by federal law.

23. Plaintiffs' parallel state law claims set forth herein will not impose any requirement or standard relating to the safety or effectiveness of the Processors, or any other matter regulated by the U.S. Food and Drug Administration ("FDA") or the Federal Communications Commission ("FCC") that is different from or in addition to any requirement applicable to the Processors under the PMA, federal law or federal regulations.

24. Plaintiffs do not challenge the FDA's approval of the design, manufacturing process or labeling of a premarket approved medical device in this action.

25. Rather, by pursuing their parallel state law claims set forth herein, Plaintiffs seek to hold Defendant responsible under state law for their damages proximately caused by the Defendant's failure to comply with the specifications and requirements of the PMA, federal law and federal regulations as they relate to the Processors.

26. Plaintiffs do not claim herein that the Processors should have been designed, manufactured, tested, marketed or labeled in a manner different from that approved by the FDA.

27. Rather, as more fully set forth herein, Plaintiffs claim that, with respect to the Processors, Defendant's failure to comply with the specifications and requirements of the PMA, federal law and federal regulations proximately caused them to suffer damages recoverable under state law.

28. As more fully set forth herein, the Processors received by the Plaintiffs and the Class members were not manufactured according to the specifications and requirements of the PMA, federal law or federal regulations and therefore were not the devices approved by the FDA.

## JURISDICTION AND VENUE

29. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, because this is a class action, as defined by 28 U.S.C. § 1332(d)(1)(B), consisting of over 100 members of all proposed classes in which at least one member of the putative class is a citizen of a different state than Defendant, and the amount in controversy exceeds the sum or value of $5,000,000, excluding interest and costs. *See* 28 U.S.C. § 1332(d)(2).

30. This Court has personal jurisdiction over Defendant and venue is proper in this Court because a substantial part of the events giving rise to the claims asserted herein occurred in this District as Defendant maintains its principal office in this District. Additionally, Defendant engaged in the wrongdoing alleged in this Complaint in this District, as it developed, tested, marketed, and sold the Processors at issue in this action in this District.

## PARTIES

31. Plaintiffs are natural persons and residents of the State of Arizona. At all times relevant, Plaintiffs have been domiciled in Phoenix, Arizona.

32. Defendant is a limited liability company organized and existing under the laws of the State of Delaware. Defendant is registered with the California Secretary of State as a foreign limited liability company conducting business in

California, and Defendant maintains its principal office in the County of Los Angeles, California.

**COMMON FACTUAL ALLEGATIONS**

**I. Cochlear Implant Systems.**

33. CI's convert sound waves into electrical signals that are sent directly to the auditory nerve. The electrical signals bypass the damaged or absent hair cells in the inner ear and the brain interprets them as sound.

34. Each CI requires an accompanying processor, an external component which includes a microphone, signal processor and transmitter. The Processor perceives sounds from the environment, converts them into digital signals, and transmits them, wirelessly, to the CI through the skin behind the ear.

35. The CI receives the wireless signals from the processor and converts the digital signals into electrical signals and sends them to the electrode array, which stimulates the auditory nerve.

36. Because CIs and Processors are medical devices that include sophisticated electronics that use RF energy to transmit signals from the Processor to the CI, they are regulated by the FCC under part 15, Radio Frequency Devices, the Federal Food, Drug, and Cosmetic Act ("FDCA") as amended by the Medical Device Amendments of 1976, the Safe Medical Device Act of 1990 and the Food and Drug Administration Modernization Act (FDAMA) of 1997.

**II. Medical Device Regulation by the FDA.**

37. The FDA classifies CIs as Class III medical devices. A class III medical device is one that supports or sustains human life or is of substantial importance in preventing impairment of human health, or presents a potential, unreasonable risk of illness or injury. 21 U.S.C. § 360c(a)(1)(C)(ii).

38. The FDA ensures the safety and effectiveness of medical devices through a process called premarket review. A CI and processor must go through the

FDA's premarket review process, which includes evaluating data from laboratory testing, clinical trials involving human subjects, and other evaluations before being sold in the United States.

39. Class III devices must also comply with the FDA's design control regulations, which require the manufacturer to "establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met." 21 C.F.R. § 820.30(a)(1). This includes requirements that the design be reviewed, verified, and validated. 21 C.F.R. § 820.30 (e)-(g).

40. Regarding validation, the FDA provides that: Each manufacturer shall establish and maintain procedures for validating the device design. Design validation shall be performed under defined operating conditions on initial production units, lots, or batches, or their equivalents. Design validation shall ensure that devices conform to defined user needs and intended uses and shall include testing of production under actual or simulated use conditions. Design validation shall include software validation and risk analysis, where appropriate. The results of the design validation, including identification of the design, method(s), the date, and the individual(s) performing the validation, shall be documented in the DHF.

41. As part of the pre-approval process, a device's RF components must undergo testing to ensure that the device meets RF standards. This is because, as the FDA has noted: "There has been rapid growth in medical devices that incorporate RF wireless technology due to the expansion of this technology. With the increasing use of RF wireless medical devices, continuing innovation and advancements in wireless technology, and an increasingly crowded RF environment, RF wireless technology considerations should be taken into account to help provide for the safe and effective use of these medical devices."[1]

[1] Center for Devices and Radiological Health, Food and Drug Administration, Radio Frequency Wireless Technology in Medical Devices: Guidance for Industry and Food and Drug Administration Staff, at Section 3e.

42. Accordingly, "[a]s part of a comprehensive quality system under 21 C.F.R. Part 820, medical device manufacturers must manage risks that include those associated with RF wireless technology that is incorporated into the medical device or device system."

43. Risk management is "a key component of the quality system, and includes risk analysis, which is part of the design control requirements under the quality systems regulation." Such risks include poorly characterized or poorly utilized wireless systems, as well as lost, corrupted, or delayed transmissions, as well as degradations caused by competing wireless signals and other electromagnetic interference. Designers are thus required under 21 C.F.R. § 820.30(g) to include risk analysis of RF wireless communications and control functions in order to receive FDA approval of the medical device at issue.

44. Designers of RF-emitting medical devices, including AB, must consider risks to other devices and patients whose wireless connections might suffer from, or cause, RF interference. Frequently used frequency bands are especially susceptible to RF interference and the interference can affect other communications products.

45. Indeed, RF energy emitted at commonly used frequencies is known to cause potential competition among wireless technologies for simultaneous access to the same spectrum. Designers of RF emitting medical devices, including AB, are instructed to consider other RF wireless technologies and users that might be expected to be in the vicinity of the wireless medical device system. These other wireless systems can pose risks that could result in medical device signal loss or delay that should be considered in the risk management process.

46. For devices that incorporate RF wireless technology, like CIs and Processors, the FDA provides specific recommendations for Premarket Submissions. For instance, the FDA recommends that the description of the device includes the RF

frequencies used, the device's maximum output power, and the range of transmission. The FDA also recommends inclusion of "any risks and potential performance issues that might be associated with wireless coexistence in a shared wireless environment," suggesting that such risks should be assessed by testing the device to account for the fact that it will likely be used near other wireless devices.

47. Designers are to consider, *inter alia*, applicable International Telecommunication Union Radio Communication Sector (ITU-R) recommendations and the impact of other users of the adjacent bands.

48. In a writing titled "Wireless coexistence" the FDA describes exactly the problem here: "A key factor affecting a wireless medical device's performance is the limited amount of RF spectrum available, which can result in potential competition among wireless technologies for simultaneous access to the same spectrum. Because conflicts among wireless signals can be expected, most wireless communication technologies incorporate methods to manage these conflicts and minimize disruptions in the shared wireless environment. The selection of RF wireless operating frequency and modulation should take into account other RF wireless technologies and users that might be expected to be in the vicinity of the wireless medical device system. These other wireless systems can pose risks that could result in medical device signal loss or delay that should be considered in the risk management process."

49. Premarket Submissions to the FDA for the "final integrated product" are summarized in the "Premarket Submission" which should include data describing the tests performed; coexistence testing, set up, findings and analysis; the interferes used and their frequencies; max output and separation distance from the device; the specific pass/fail criteria for the testing at issue; a description of how the device and wireless functions were monitored during the testing and determined to meet the pass/fail criteria; references to the appropriate devices, standards or technologies used for the tests; explanations of any deviations from the selected standards; modes of device

operations during testing and explanations for the significance of these modes; pass/fail criteria for the testing that takes into account specific device functions that should not degrade (such as processors), functions that may degrade (such as displays), and device recovery after degradations; and if modifications were made to the device in order to pass testing, a statement that such modifications will be incorporated into final production units.

50. Testing information and results from the "final integrated product" are to be summarized in the Premarket Submission, which should include: Testing information and results from the "final integrated product", which should include: Description of the tests performed (e.g., RF wireless performance, EMC immunity and emissions, test levels or limits) and the protocol used; Reference to appropriate medical device, RF wireless technology, or EMC standards for the tests; Explanations for any deviations from the selected standards; Mode(s) of device operation during testing, with an explanation of the significance of these modes; Specific pass/fail criteria for the testing such as specific device related acceptability criteria for each device mode or function tested. These criteria should include the following: Specific device functions that should not degrade (such as CPU failure); Specific device functions that may degrade (such as display fluctuation and device recovery from degradation, for example after removal of the electrostatic discharge.

51. If modifications were made to the medical device to pass testing, a statement that all modifications will be incorporated into all final production units must be made (test data summaries).

52. More succinctly, Premarket Submissions for the device should reflect the device's performance in conditions that accurately reflect the device's expected performance in real-world conditions.

53. A device is deemed to be "adulterated" if, among other things, it fails to meet established performance standards or if the methods, facilities, or controls used

for its manufacture, packing, storage, or installation are not in conformity with federal regulations pursuant to 21 U.S.C. § 351 and 21 C.F.R. Part 820.1(c).

54. Each introduction of an adulterated device into interstate commerce is a violation of federal law. 21 U.S.C. § 331(a).

55. A device is deemed "misbranded" if, among other things, its labeling is false or misleading in any particular way, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. 21 U.S.C. § 352.

56. AB was, at all times relevant herein, required to comply with applicable FDA regulations, including FDA regulations relating to records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of its medical devices.

57. Adverse events associated with a medical device must be reported to the FDA within 30 days after the manufacturer becomes aware that a device may have caused or contributed to death or serious injury, or that a device has malfunctioned and would be likely to cause or contribute to death or serious injury if the malfunction was to recur.

58. Such reports must contain all information reasonably known to the manufacturer, including any information that can be obtained by analysis, testing, or other evaluation of the device, and any information in the manufacturer's possession. In addition, manufacturers are responsible for conducting an investigation of each adverse event and must evaluate the cause of the adverse event. 21 C.F.R. Part 803.50.

59. AB has post-market surveillance responsibilities to evaluate post-market clinical experience and to timely provide safety and efficacy information to the healthcare community, consumers and the FDA.

60. AB is also required to monitor its own manufacturing operations and

quality controls to ensure its products uniformly conform to the manufacturer-approved design, specifications of approval as well as its representations and warranties.

61. Time is of the essence when, as part of its post-market monitoring obligations, AB detects safety signals that could indicate that a public safety problem stemming from its products exists.

62. A manufacturer's delay in reporting post-market information, even for a few weeks or months, can have disastrous consequences. In such circumstances, more patients are harmed by using the product without understanding its true risks. This is why a manufacturer must not only completely and accurately monitor, investigate and report post-market experience, but it must make timely reports.

**III. Radio Frequency Device Regulation by the FCC.**

63. Under the regulatory scheme of the FCC, CIs and Processors are considered Class A digital devices. Class A digital devices are defined as a digital device marketed for use in a commercial, industrial, or business environment, exclusive of a device which is marketed for use by the general public, or which is intended to be used in the home. 47 C.F.R. § 15.3.

64. In or about August 2009, AB's CIs and Processors were categorized as unintentional radiators of RF energy.

65. An unintentional radiator is a device that intentionally generates RF energy for use within the device, or that sends RF signals by conduction to associated equipment via connected wiring, but which is not intended to emit RF energy by radiation or induction. 47 C.F.R. § 15.3 (z).

66. Based on their classification as an unintentional radiator, AB's devices are exempt from complying with some specific technical standards but remain subject to the general conditions of operation in 47 C.F.R. § 15.5, including the requirement not to cause harmful interference. Harmful interference is defined in 47

C.F.R. § 15.3(m) as "[a]ny emission, radiation or induction that endangers the functioning of a radio navigation service or of other safety services or seriously degrades, obstructs or repeatedly interrupts a radiocommunications service operating in accordance with this chapter."

67. The field strength of radiated emissions from a Class A digital device is categorized as an unintentional radiator is set forth in §15.109.

68. CIs and Processors are considered compliant with FCC regulations if they "may be shown to comply with the standards contained in the Third Edition of the International Special Committee on Radio Interference (CISPR), Pub. 22 'Information Technology Equipment – Radio Disturbance Characteristics – Limits and Methods of Measurement' (incorporated by reference, see § 15.38)." This testing scheme is commonly known as CISPR-11.

**IV. AB Has a Checkered Past and Puts Profits Over Patient Safety.**

69. AB's wrongful conduct has caused grave harm and has resulted in thousands of revision surgeries throughout the world, under general anesthesia and involving many risks to patients including permanent hearing loss, trauma to the cochlea, post-surgery vertigo, dizziness, nausea, paralysis of the facial nerves, tinnitus, cerebrospinal fluid leak, infection, loss of taste and bleeding among others.

70. AB's wrongful conduct impacts the entire spectrum of its patients. Infants, children, adults and the elderly, have all required revision surgeries.

71. All of AB's patients make up a very vulnerable part of our population.

72. Following the revision surgeries, patients are required to undergo many months of rehabilitation work with an audiologist in an effort to improve their hearing.

73. Aside from the personal injuries, AB's wrongful conduct over the decades has caused enormous economic losses and has required innocent patients and their families, the U.S. government and healthcare insurers to expend tens to hundreds of millions of dollars on healthcare necessitated by the failures of its defectively

manufactured CIs and Processors.

## V. AB's Recall History.

74. The Clarion Multi-Strategy Cochlear Implant System is the initial device from which later cochlear implant systems manufactured by AB originate. AB submitted a Pre-Market Approval ("PMA") application to the FDA for the Clarion on or about June 29, 1994.

75. The FDA approved the PMA for the Clarion on or about March 22, 1996.

76. Later iterations of the Clarion included the "HiRes 90K" and the "HiRes 90K Advantage" (hereinafter collectively referred to as the "90K Devices") cochlear implants which were introduced to the market in or about 2016.

77. Still later iterations of the Clarion included the "HiRes Ultra" and the "HiRes Ultra 3D" (hereinafter referred to as the "Ultra Devices") cochlear implants which were introduced to the market in or about 2016.

78. As more fully set forth below, AB's conduct resulted in recalls of the 90K Devices and the Ultra Devices causing hundreds, and more likely thousands, of patients in the United States to undergo revision surgeries that would have been unnecessary absent AB's wrongful conduct.

### 1. 2004 Recall of the 90K Devices Due to Presence of Elevated Moisture Levels.

79. According to the FDA's database for medical devices dated September 27, 2004, all 90K Devices were recalled due to the potential presence of moisture in the internal circuitry.

80. Patients, including infants and children suffered symptoms including sudden pain, loud noises, and intermittent functioning as a result of the defect.

81. The 90K Devices were subsequently reintroduced into the market.

### 2. 2006 Recall of the 90K Devices Due to Presence of Elevated Moisture Levels.

82. In March 2006 certain 90K devices were recalled again for elevated

moisture levels which caused intermittent function, complete loss of sound, sudden discomfort, pain, noise, or popping" according to an entry in the FDA database for medical devices dated March 8, 2006.

83. AB claimed that the elevated moisture levels were caused by a component in the 90K Devices that was manufactured by a new supplier that was unauthorized to supply the component.

84. Worldwide, a total of just over 4,000 90K Devices affected by the recall were implanted between 2003 and 2006. Between one-third and 50 percent of the 90K Devices had to be explanted due to recall-related failures.

85. In July 2008, AB paid a $1.1 million civil penalty to the FDA for its failure to notify the FDA of the new supplier according to an article published in Medical Device and Diagnostic Industry on July 18, 2008.

86. The only jury verdict relating to the failure of a 90K Device provides some idea of the scope of the damage caused by AB's defective 90K Devices. In January 2006 a minor was implanted with a defective 90K Device. The 90K Device failed because of moisture ingress. The minor underwent a revision surgery to replace the 90K Device. In 2013, the claims were tried before a jury, which rendered a verdict against AB in the amount of $7.25 million in damages, inclusive of punitive damages.

**3. 2010 Recall of HiRes 90K Devices.**

87. In November 2010, AB issued a recall of all unimplanted HiRes 90K Devices after reports that patients experienced severe pain, overly loud sounds and/or shocking sensations following the activation of the device according to a November 23, 2010 entry in the FDA's database.

88. Thereafter, 90K HiRes Devices were again reintroduced to the market.

**4. AB's Defective HiRes Ultra and HiRes Ultra 3D Cis.**

89. AB's conduct regarding its HiRes Ultra and Ultra 3D devices is particularly egregious.

90. On or about February 17, 2020, AB sent an "Urgent Field Action Notification" via email to healthcare providers informing them that it had detected an increase in the number of HiRes Ultra and HiRes Ultra 3D cochlear implant devices being explanted or the potential of being explanted due to performance issues (impedance drop and reports of hearing performance degradation, interruption of stimulation, and degraded performance) resulting from fluid ingress at the electrode. See Exhibit 1, attached hereto.

91. On or about February 17, 2020, AB sent an "Important Notification" to HiRes Ultra and HiRes Ultra 3D cochlear implant recipients via FedEx to inform implant users or parents/caregivers of the issue of prolonged hearing degradation due to physiological fluid entering into the electrode (not the hermetic seal) and causing interruption of stimulation that can negatively affect device performance. See Exhibit 1.

92. On or about February 18, 2020, AB issued a "Voluntary Field Corrective Action" or recall and retrieval of unimplanted HiRes Ultra and HiRes Ultra 3D cochlear implants. See Exhibit 1.

93. On or about February 21, 2020, AB issued an "Important Notification to HiRes Ultra/HiRes Ultra 3D Cochlear Implant Recipients" stating that AB was aware of "body fluid entering the electrode" and that on February 18, 2020, it issued a "voluntary removal from the market all of the initial versions of unimplanted HiRes Ultra/HiRes Ultra 3D." AB confirmed that the device related issue may require revision surgery and that the "only potential for patient harm are the risks associated with a surgery." See Exhibit 1.

94. On or about October 31, 2022, AB issued an "Update to the Voluntary Field Corrective Action of HiRes Ultra and Ultra 3D," confirming the failure of the device due to "fluid impacting the implant electrode." AB asserted "While this issue does not lead to recipient injury, it may require revision surgery." See Exhibit 1.

95. AB recalled the HiRes Devices due to the ingress of physiological fluid at the electrode pocket, causing short(s) and/or causing interruption of stimulation that negatively affected device performance, causing impedances to drop, interrupting stimulation thereby causing prolonged hearing degradation and degraded performance.

96. Upon information and belief, the silastic material, which filled and/or sealed the electrode pocket, and/or which covered the wires/electrode array of the HiRes Devices becomes compromised permitting physiologic fluid to enter the electrode pocket.

97. In December 2022, Dr. Thomas Lenarz, a world-renowned otolaryngologist with a sub-specialty in cochlear implants, partnered with Dr. Lutz Gärtner, his colleague at a clinic in Hannover, Germany, to publish a study in the medical journal The Laryngoscope, which showed the dramatic extent of the defect affecting the HiRes Devices. The article is titled "Advanced Bionics HiRes and Ultra 3D series Cochlear Implant Recall: Time Course of Anomalies." See Exhibit 2.

98. Between September 2016 and October 2019 Dr. Lenarz and Dr. Gärtner implanted 349 HiRes Devices at their clinic in Hannover, Germany, in the context of a clinical study conducted for AB. Representatives of AB were on site at the clinic and tested HiRes Devices suspected of malfunction using proprietary EFI software.

99. As detailed in their study, as of March 2022, more than 50% of the HiRes Devices showed anomalies, and nearly 35% of them had already required revision surgery to replace them. The study also concluded that the median survival time without anomalies of the devices, that is, the average time it took for the devices to fail, was 1,062 days.

100. Throughout the course of the clinical trial, and as late as April 2019, Dr. Lenarz and Dr. Gärtner had communicated with AB and advised it of the unique type of failure mode, the number of failures, the likely cause of the failures, and had

provided it with numerous devices, which had been explanted, so that AB could analyze the root cause of the failures.

101. Each explanted device was provided by Dr. Lenarz and Dr. Gärtner's team to AB and it conducted individual device failure analyses ("DFA"). At the time of publishing their study, 76 of 80 completed DFAs revealed that the reason for the device failure was a short-circuit caused by fluid ingress in the electrode pocket.

102. AB failed to provide notice of the findings of Dr. Lenarz and Dr. Gärtner to the FDA.

103. Dr. Lenarz and Dr. Gärtner determined that the failure mode in the HiRes Devices involves fluid that migrates into the electrode pocket of the implant, causing conductive connections between some electrode leads, which results in a drop of impedance. The result is a loss of hearing, distorted sound and impaired speech comprehension.

104. In their article, Dr. Lenarz and Dr. Gärtner noted that a new pattern of anomalies, specific to the HiRes Devices, was first detected in April 2019.

105. However, given the periods of implantation of the HiRes Devices, as well as observed periods for the first appearances of anomalies, it is certain that cases highly indicative of device failure were observed by Dr. Lenarz and Dr. Gärtner well before April 2019.

106. Given that Dr. Lenarz and Dr. Gärtner were conducting a clinical study for AB and that the latter was on-site at their clinic, it is highly probable that AB was informed of all instances of possible device failures.

107. Despite this knowledge, AB continued to market and sell the HiRes Devices which were implanted into unknowing patients.

108. In June 2019 at the latest, AB undertook steps to obtain regulatory approval from the FDA of the new "Version 2 (V2)" of the HiRes Devices as appears from an excerpt of the FDA's database for medical devices.

109. Notwithstanding this, AB continued to market and sell the V1 versions of defective HiRes Devices which were implanted into unknowing patients.

110. Not until December 23, 2019 did the FDA approve the "V2" models, as appears from an excerpt of the FDA's database for medical devices.

111. Incredibly, AB continued to market and sell V1 HiRes Devices through February 2020, which were implanted into unknowing patients. It was not until February 2020 that AB issued its recall as detailed herein.

112. Even when AB issued the recall of its V1 HiRes Devices in February 2020, it downplayed the risks of the V1 HiRes Devices, maintaining that the performance was observed in a "limited number" of devices, that the recall was being made with "an abundance of caution" and that the "situation does not present a device-related safety issue" as appears in AB's media release dated February 18, 2020. See Exhibit 3.

113. As the foregoing illustrates, AB knowingly puts profits over patient safety.

**VI. Facts Specific to Plaintiffs.**

114. Plaintiff Tina is Plaintiff Grant's mother.

115. Plaintiff Brian is Plaintiff Grant's father.

116. Grant received his CI manufactured by AB on or about February 13, 2014. Shortly thereafter, Grant's CI was activated and the Processor manufactured by AB and purchased by Tina and Brian was first utilized with Grant's CI so that he could hear.

117. Grant was a minor when he received his CI and Processor.

**VII. AB's Fraud Pertaining to the Processors.**

118. Even though its Processors could not pass CISPR-11 testing, AB obtained "passing" test scores for the Processors by fraudulent means and thereafter submitted those fraudulent test results to regulatory agencies around the world,

including the FDA, in order to obtain regulatory approval.

119. For example, from December 2010 through at least August 2017 AB manipulated its testing methods, procedures, and equipment to ensure that Processors that would not otherwise meet CISPR-11 standards would instead yield results within the ranges required to pass CISPR-11 testing.

120. As part of its scheme to defraud Plaintiffs and the Class members, AB created custom testing boxes that allowed it to fraudulently obtain lower RF emissions from its Processors.

121. The boxes, which came to be known internally at AB as "Dave's Magic Boxes," were used to block RF emissions to ensure that an otherwise non-compliant Processor would pass CISPR-11 testing.

122. "Daves Magic Boxes" fraudulently created testing conditions that did not mimic the real-world environment as required under FCC regulations, but instead created an environment custom tailored to conceal the strength of RF emissions from the Processor being tested. As a result, the Processors were much more likely to cause harmful interference in the real world than indicated by the test results AB fraudulently obtained.

123. AB's Processors were not capable of meeting the required emissions standards, so AB's engineers took further action to manipulate the physical testing environment in which it tested the Processors.

124. AB's engineers also created software specifically designed to command diminished operating conditions in furtherance of its fraudulent scheme to have a better chance to obtain a passing test result.

125. AB also used a nine-inch cable, instead of the cable normally used for testing, which would have been up to 42 inches long in yet another attempt to game the system and obtain fraudulent test results.

126. AB's Processors also exhibited enough variance in their RF emissions

so that AB was able to hand-select the lowest emitting units to be used for testing purposes. Even though it was required to test Processors representative of those that would be marketed and sold to the public, AB tested only those Processors that were outliers, in that they were close enough to the limits that they could be made to pass after AB manipulated the hardware, software, and testing environment.

127. Any Processor tested with a cable longer than nine-inches, without doctored software, and without a custom designed enclosure would fail CISPR-11 testing and would thus not be fit to be released to the market, much less advertised and marketed as having complied with regulations that would have kept it off the market had its true test results been made available.

128. AB executives were aware that the Processors did not pass the required testing. In fact, AB provided the FDA with fraudulent results after an employee of the company had expressed his concerns that the testing results were improperly obtained. Notwithstanding the foregoing, AB's test results were passed off to regulators as showing the Processors in full compliance.

**VIII. AB's Fraudulent RF Testing and the Neptune Processor.**

129. As part of his work on the Defendant's Neptune Processor, David Nyberg ("Nyberg"), Defendant's Principal RF Electrical Engineer R&D at Defendant's Valencia, California facility from December 2010 to August 2017, was provided with a summary of "Emission Test Results" prepared by his predecessor, which was presented to Defendant's leadership on September 30, 2010 (the "September 2010 Presentation").

130. The September 2010 presentation covers testing done as early as 2005, and had the stated objective to "obtain emission compliance with margin sufficient to cover production variations for newly developed body worn processor (Neptune)".

131. In that September 2010 Presentation, Nyberg's predecessor admitted that emissions testing was "historically not met with previous body worn processors

(Clarion, S-Series, PSP)".

132. TUV SUD is a Certified lab serving the Americas for Wireless, EMC and Electrical Safety.

133. A slide in the September 2010 Presentation noted that "TUV records show compliance with Harmony BTE (behind-the-ear) processor," a statement that was supported by a graph. The graph is from the official emissions test report, which Nyberg believed was performed at TUV in San Diego, California on June 10, 2005, and purports to show a passing test score.

134. However, by the time of Nyberg's tenure, this June 2005 test had become a running joke among those involved in AB's emissions testing. As it was later explained to Nyberg by AB's Vice President of Regulatory Affairs, as well as by the Director of Engineering, the testing team took a Harmony sound processor to the test lab and the results were so bad that it was clear there was no way the unit would ever pass. Accordingly, the testing team switched the unit into "mic check mode" which completely turns off the RF transmitter in order to obtain a passing score.

135. Thus, the graph that is part of the September 2010 Presentation, which appears to indicate a passing score, and which, on information and belief, was submitted to the FDA, was obtained by turning the unit off.

136. Another slide in the September 2010 Presentation shows another test of the Harmony sound processor that was performed on March 17, 2009. This test makes clear that even two years later, the Harmony processor was incapable of passing emission testing.

137. As noted above, the stated objective of the September 2010 meeting was to "obtain emissions compliance with margin sufficient to cover production variations for newly developed body worn processor" (Neptune). At that time, Nyberg's predecessor summarized work to date by stating that "Neptune evaluations have shown a narrow pass with one unit, but many overages and variability dependent on

the accessory configuration."

138. The September 2010 Presentation openly acknowledged that there was little to be done about the processor, cable, and headpiece, stating that "given the fixed nature of the implanted device and the difficulty of attaining large improvements with the processor, cable and headpiece; [sic] attention has been devoted to reducing emissions by controlling the generated 49MHz fundamental and the test configuration (within the rules of the CISPR test method)." A list of specific issues with the hardware that contribute to the problem included: High Board-fill with components doesn't allow for top shield layer; Vertical via map doesn't allow for complete vertical shielding and burning of hot traces; wire bonding, test pads, and test fixturing creates undesirable connects between top and bottom layers; Open solenoid inductors; and Plastic enclosure provides no wielding nor isolation.

139. In early October 2010, Defendant hired an outside consultant to review the design and identify easy and inexpensive steps to remedy the Neptune's emissions problems. His recommendations were shared first with Nyberg's predecessor and later with Nyberg, the new technical lead for the Neptune model Processor after fall 2010.

140. Unfortunately, none of the consultant's suggestions were able to solve the emissions issues for the Neptune Processor.

141. Nyberg's first assignment as a contractor for Defendant was Technical Lead for the Neptune Processor, and on that same day he requested from his direct supervisor the "written approved procedure for EMI testing" for the company.

142. Nyberg received a response from the Director of Engineering: "There currently is no such procedure. EMI is not something that was a major concern before for our products, but the regulations have become tighter. It is not 100% clear to which extent which regulations apply, but CISPR-11 is one that we need to meet. … The way CISPR-11 is written leaves some room for interpretation. Our interpretation is

the one I briefly mentioned this morning where we would use non-radiating equivalents of the system components that are not part of the [Device Under Test] but are required to operate the [Device Under Test] in a normal fashion. For Neptune, for instance, this is the little aluminum box the machine shop is modifying for us, which will hold a reference implant and a headpiece with an "RF feedthrough" to the outside. We are going to need to formalize and approve an EMI test procedure that complies with the regulations we need to meet and that we adhere to internally, starting with Neptune and going forward for all future developments."

143. On Nyberg's second day at work, his supervisor expounded on his plan to use a "Test Box" (sometimes later called a "Reference Implant Box" and which internally became known as "Dave's Magic Boxes"). These Test Boxes were used to block RF emissions to ensure the device could pass CISPR testing.

144. Nyberg's supervisor showed him a prototype Test Box on his second day.

145. The test plan was rife with caveats that the results will be "for engineering use only".

146. On December 22, 2010, Nyberg wrote to the same group to report on the results of in-house testing he had performed.

147. Initial results led Nyberg to believe that "we have little to worry" with the testing. He tested the Neptune in various configurations, with and without the Test Box, to determine which was the best configuration to take to the testing lab known as CKC Laboratories.

148. On December 23, 2010, AB's Director of Engineering instructed Nyberg "to validate your setup further and understand where we are doing well [with respect to] emissions, you should also run some Harmony and PSP devices and take some measurements with a native ICS (not the test box)."

149. Later the same day, Nyberg realized that a crucial piece of test equipment

he had been using was not providing valid data, and the Neptune emissions issue was therefore much worse than it had initially appeared.

150. Nyberg informed the group that "[we] are failing and pretty hot too!" and in response, he received a reply from the Director of Engineering, sent only to Nyberg, instructing him to "please keep the emails narrowly distributed."

151. The first official RF emissions testing of the Neptune sound processor occurred on or about December 20th and 21st, 2010 at CKC labs in La Brea, California.

152. On December 23, 2010, Nyberg wrote to AB's then Director of Engineering explaining some of the settings used to get the best results possible, and that in spite of that effort, the unit still failed the test.

153. Nyberg's email provoked a Christmas Eve response from AB's Director of Engineering, asking Nyberg to give him results for the "Neptune with 9" cable (no programming or control header).

154. Nyberg responded on Christmas Day, discussing what could be done to achieve a passing result and noting "I think I see where you're going with this…shortest cable, lowest PWR setting, maybe we can get by".

155. From that point on, tweaking the testing conditions (rather than fixing the failure to meet the required RF specification) were the main concern of everyone employed by AB, including Nyberg and AB's senior management.

156. In an effort to figure out how to get the Neptune Processor to pass the RF testing, Nyberg took five Neptune units for testing and discovered that the problem was a moving target. Some units fared better than others but only under carefully "doctored" test conditions.

157. Any Neptune unit tested using "real world" case conditions failed consistently, and quite badly if the longer coax cables were used.

158. In January 2011, Nyberg's trial period for employment with Defendant

ended and he was hired as a full-time employee.

159. On January 18, 2011, those expected to attend the “Neptune Core Team Meeting” the next day received an email stating that “the company needs to get Neptune to market now more than ever" and providing a list of “gating” issues that were holding up Premarket Submission.

160. In related conversations, it was suggested that to have any chance of getting Neptune through emissions testing, Nyberg would be required to screen dozens of units and select those with the lowest emissions signatures, based on the evidence discovered during the CKC labs test in late December 2010.

161. Nyberg memorialized this in an email to the team in which Nyberg stated that “based on this list, I am prepared to go forward as long as I have access to enough units to screen. As soon as I have them, I will prescreen at Advanced Bionics, then verify at CKC. Nyberg advised that he would schedule CKC verification as soon as his in-house prescreen was complete. He further advised that only units that pass in house will go to CKC and he asked for any comments regarding his plan.

162. For this “Prescreen”, Nyberg was given a bucket of approximately twenty-four Neptune Processor prototype units. From those, he identified a single Neptune unit that had a much lower emission signature than any other unit. This low emission unit then became the single unit that he would take to the test labs (including later to China) for official passing test reports, all based on the “doctored” operating parameters.

163. The doctored parameters were not clearly stated in writing until much later, but eventually (in October 2013), Nyberg’s supervisor laid out the practice of altering the sound processor under test to ensure that the hardware presented as little harmonic radiation as possible.

164. In providing an overview of Defendant’s standard testing protocol, Nyberg’s supervisor stated the following: “Obtain a known good Neptune for which

recent passing ATE data is available…; Insert a fresh battery and start the process or from the battery, with no control header attached; Verify the presence of stim on the channel that is brought out of the box; Using BEPS, lower the RF level by 1, unlock/relock the implant, and keep doing this until the processor no longer relocks. Record the last RF level the processor locked successfully and use the ATE Neptune Ate datasheet to look up the RF power of that Neptune processor put out for that RF level. Record the RF power. This will let us keep track of the minimum RF power that is required to lock to the implant in each box, and if that parameter were to shift between calibration cycles, we will see that. The acceptance limit for this particular test would be that required power to lock shall not exceed the previously recorded RF power level by x% (20% perhaps?).”

165. In other words, AB’s process was to turn down the RF power setting to as low as possible and use that as the test case.

166. This was the same method used throughout Nyberg’s tenure of employment at AB from January 2011 to August 2017 for both the Neptune and Pantera/Naida Processors, and at the time Nyberg left AB, it was anticipated that it would be applied to the new Coguaro design as well.

167. It appears that the Test Boxes, at least, were also used for testing with the CPI3 (a device used by clinicians to program the units).

168. A passing score generated by turning down a Processor by this artificially low-level means that the majority of Processors operating in the field are violating RF interference limits, because the settings described above, which barely made the system work at all, do not resemble real-world therapy settings.

169. Over three days from March 2, 2011 to March 4, 2011, Nyberg personally took the single, hand-selected, Neptune Processor to the TUV test lab near San Diego, California where he obtained a “passing” score for the Processor.

170. The “passing” score was obtained only by (a) hand-selecting the

Processor with the lowest (in fact, abnormally low) emission; (b) using the shielded Test Box; (c) using the shortest possible coax cable; and (d) using the "doctored" specifications described above.

171. Nyberg, and others, had personal knowledge that testing performed either without a Test Box or with a coax cable longer than 9 inches results in multiple harmonic failures.

172. A review of the emissions results graph mentioned herein details that the Neptune Processor score fell within the margin of error the lab is able to certify. In other words, four of the harmonic emissions were technically under the limit line for failure but were within the margin of error and so could easily have failed if the test was repeated.

173. After his return from the TUV test lab, Nyberg communicated his concern with the results to Defendant's executive management but was told that a passing report was "good enough."

174. Defendant submitted the Premarket Submissions to the FDA containing this fraudulently obtained result, and efforts at dealing with the Neptune Processor's emissions profile temporarily cooled off.

175. In early February 2012 Defendant's Vice President of Regulatory Affairs informed Nyberg that China and South Korea had requested EMC testing samples of the Neptune Processor design.

176. The Vice President of Regulatory Affairs was concerned whether the passing conditions Nyberg had created for the U.S. tests could be replicated overseas so that the Neptune Processor would still pass.

177. Accordingly, at the direction of his immediate supervisor and executive management, Nyberg was tasked with replicating the Test Boxes so that the emissions issues could be masked from these international testing entities.

178. The goal was to keep the level of harmonic emissions under the limit line

for international testing (CISPR-11), which Defendant's management knew could only be achieved by gaming the system and using the Test Boxes to shield the Processor.

**IX. The Naida Processor.**

179. As early as February of 2011, a month before Neptune had "passed" its emissions testing, Nyberg was asked to assist in what was then known as the "Pantera project" which later became the Naida line of behind-the-ear (BTE) sound processors (referred to herein as the "P/N" design).

180. As early as November 2011, AB's engineers learned that the P/N design processor had also failed to meet RF interference requirements.

181. Even though a key priority of the Naida design team was to significantly reduce the processor's RF emissions, the Naida Q30, Q70, and Q90 devices failed to meet regulatory requirements unless AB fraudulently manipulated the testing.

182. Nyberg, at the demand of AB management, obtained fraudulent "passing" test results for the Q30, Q70 and Q90 models of the Naida BTE processors, which were also submitted to the FDA.

183. In fact, the RF energy from the Naida device's new Pantera sound processor was sufficiently intense to cause interference with the device's own wireless link (the Hi-Ban system, by Phonak).

184. Even though the Hi-BAN system and the Pantera sound processor operate at different frequencies, 10.6Mhz and 49 MHz respectively, the harmonics from the sound processor were strong enough to cause interference for the Hi-BAN devices.

185. In April 2011, AB's design team was struggling to get the wireless link (the Hi-Ban system by Phonak) to work with the new Pantera sound processor due to interference from the main 49 MHz power and telemetry transmitter.

186. Specifically, the harmonics coming from the new main RF transmitter

design was so overwhelming that the sensitive Hi-Ban system could not communicate with the MyPilot remote control products, which were also from Phonak.

187. Throughout the remainder of 2011, Nyberg participated in AB's ongoing efforts to solve this issue, including conferences with Phonak engineers. Ultimately, a report on possible solutions was submitted to the Senior Director of Program Management (later the Vice President of R&D), but none of the solutions were successful.

188. Internal work on this continued throughout the summer, but the team was no closer to a solution. In late August, AB consulted with Nyberg's predecessor, who again recommended using the same outside consultant.

189. As early as November 2011, AB received reports that its Harmony BTE processor was causing RF interference in real-world conditions.

190. Harmony's RF interference emissions were strong enough to jam nearby cell phones, causing them to drop calls. This led hospital officials at Johns Hopkins, Henry Ford, and other hospital systems to report RF interference from AB's Processors to AB.

191. In November 2011, AB's clinical engineer emailed the Director of Engineering to inform him of the reports from Johns Hopkins, Henry Ford and other hospital systems regarding the RF interference, including that the Harmony BTE Processor was causing Verizon cell phones to drop calls.

192. The same email acknowledged that AB was aware of this issue since 2009 and had apparently replicated it in the lab.

193. AB's Director of Engineering inquired of this to Nyberg and his supervisor. Nyberg was very concerned because he already knew that the problem would not be fixed in future products because the Harmony design and the new P/B design were very similar, and the transmitter technology was nearly identical.

194. In December 2011, the first engineering samples of the new Pantera

design were expected to arrive, but there were still concerns about the RF emissions. The first in-house diagnostics showed failure, even with all the "tricks" AB employed to deceive the RF emission testing process.

195. On May 24, 2012, a PowerPoint presentation on performance issues with the P/B design effort was sent to Nyberg, his supervisor and the Director of Engineering, among others. The cover email explained AB's going-forward plan with respect to RF emissions: "[Nyberg] will take measurements on both BTE varieties and call me with the results tomorrow morning. If one BTE is significantly better than the other in terms of EMI testing, we will choose the layout with lower emissions. If both pass EMI testing (ha!) or there is no discernible difference we will choose the 090 due to the improved efficiency."

196. On June 7, 2012, Nyberg drafted a summary of testing that listed the severe issues that were still present with the P/N design. Emissions were still a grave concern in mid-June, and in mid-July, the water-proofing process (P2i) had a further negative effect on the emissions performance of the unit.

197. Later, in July 2012, Nyberg produced a second report on emissions for the P/N design.

198. Nyberg noted that, "[all] Advanced Bionics Sound Processors are required to comply with and pass CISPR11 RF levels for both emissions and susceptibility." He went on to say "[d]uring the design phase prior to V&V, Pantera was tested in-house using a calibrated 5402 GTEM cell from ETS Lindgren. It was realized at that point that the Pantera design suffered from excessive RF harmonic emissions. Suspicions were verified using calibrated measurements in the 10-meter anechoic chamber at TUV in San Diego."

199. Nyberg went on to show the "nearly 6 dBuV per meter margin" that had been obtained through the various mitigation suggestions and included graphs showing this improvement.

200. Also around mid-July, 2012, Nyberg began to obtain "official" emissions scans from Element Materials, an accredited lab in Irvine. While there, he took the opportunity to check emissions outside the test window and discovered that, just like the Harmony, the P/N design was likely to be a "cell phone call killer."

201. In October 2012, Nyberg performed a collection of "engineering scans" at the in-house test lab to evaluate how far out of compliance the P/N design was and what the best result to be achieved would be. The results demonstrated that longer lengths of coax from the headpiece to the sound processor would not work, and that without the Test Boxes, passing scores could only be achieved if the shortest cables were used and the sound processor was set to impossibly low power settings.

202. In December 2012, AB received its first formal testing for the P/N design at TUV labs in San Diego, CA. This formal report also appears to contain a passing test result. However, the harmonic emissions at 980 MHz (the twentieth harmonic) has zero margin, despite being conducted on a handpicked unit with its RF power turned as low as possible and the use of the Test Box. Given the parameters of certainty for the testing lab, this unit was very likely to fail if tested again.

203. Overall, this testing protocol (Test Box, short cables, low power settings) was successful until other countries started tightening their testing requirements. South Korea, Brazil and China were among the first to ask for units to be sent for testing.

204. In the case of South Korea and Brazil, AB was able to convince the testers to allow its engineers to "pre-program" the units so that they would be "properly programmed."

205. A December 2013 email from Nyberg's supervisor dealing with the South Korea testing lays out another tactic for faking a passing score that was dubbed "Fake Lock." This tool was developed for situations in which the foreign lab would not permit the use of the Test Boxes.

206. Fake Lock allowed AB to fool the sound processor into thinking it was working without the need for it to actually be locked to an implant, which normally would be required for operation. This, in turn, allowed AB to turn down the RF power to levels that wouldn't support normal system operation in any way.

207. RF power levels range from 0 to 15, with a control for standard power or double power, which was needed for patients who for some reason (e.g., an unusually thick scalp) required a higher than usual power output in order to receive therapeutic benefits.

208. The P/N design can deliver as little as a few milliwatts up to about 110 milliwatts of RF power.

209. Typically, the minimum for basic therapy is in the tens of milliwatts. With Fake Lock, that output could be turned down as low as needed to pass tests, well below the minimum needed to actually provide therapy. In fact, Fake Lock allowed the power to be turned below a few milliwatts - so low that the implant wouldn't even have enough power to turn on.

210. Unlike South Korea and Brazil, the Chinese CFDA did not allow preprogramming. Moreover, the test engineers wanted to test in a variety of configurations, some of which used "a fairly long cable" which panicked AB senior management and led to more end of December orders to test in the configurations being required by the Chinese testers.

211. Eventually, Nyberg, along with AB's Principal Embedded Software Engineer and Senior Manager of Production Integration, were sent to China in March 2017 to sit with the test technician and ensure the ruse continued to work.

212. An end of August 2014 report shows the methodology that was developed for achieving passing scores. This report shows that the unit was barely passing at the thirteenth harmonic of 637 MHz, with only .7dB/uV of margin, as opposed to the 6dB/uV below the limit line that is typically preferred in order to

account for variability between test labs.

213. In January 2016, AB hired a new director for the Systems Department, filling a job that had been open for two years. As the new director began to come up to speed, he became concerned about the same issues that Nyberg had been raising with respect to AB fraudulently concealing the Processors' RF problems rather than trying to solve them.

214. The new director asked that Nyberg come into the test lab at night and perform testing for his eyes only, in order to learn the true state of affairs. In March, two months after his arrival, the new director tasked Nyberg with drafting a definitive report on the true state of Pantera's emissions issues.

215. The new director asked that this report be provided to him only via thumb drive and forbade Nyberg from using email to correspond about the project.

216. As the resulting presentation stated, "passing configuration for emissions testing of all "Active" AB products is stringently "choreographed" by compliance / RF dept" and there was "[n]o passing configuration otherwise."

217. The presentation further warned that the "random testing promised by Chinese authorities" was a "huge business risk" and required a "constant ongoing effort" to keep the units passing by providing test rationales and "preprogrammed" tests, and that there were "odd RF related reports from the field" that included cell phone and Bluetooth issues.

218. Nyberg showed test results obtained as a result of the "choreography" pointing out that the results still had no margin and highlighted the results against the European limits as well as the wi-fi, Bluetooth and cell phone bands to show the problems. Finally, Nyberg pointed out the increased issues with the use of even a 6-inch cable.

219. Despite these efforts, the next design after Pantera, the Coguaro line, exhibited the same issues.

220. By the time AB terminated Nyberg, Coguaro had yet to be released. At the time of his termination, the design team was finding it difficult to get the new Bluetooth module to work with Coguaro because of the device's own RF harmonic emissions issues.

221. In June 2016, two months after presenting the report to the new director, the new director left AB and Nyberg was transferred within AB from Electrical Engineering to Design Assurance. In his new role, he was to be the local expert for electrical compliance and to assist the design teams in testing and analysis.

222. In March 2017, Nyberg and colleagues again traveled to Beijing in order to shepherd the Naida Q30, Q70 and Q90 through Chinese testing.

223. As more fully set out below, Nyberg ultimately filed a lawsuit under the whistleblower, or qui tam, provisions of the False Claims Act based on AB's conduct. The lawsuit was filed under seal.

## X. AB Settles Whistleblower False Act Claims and Enters Corporate Integrity Agreement.

224. A corporate integrity agreement is a document outlining the obligations a company involved in health care in the United States makes with a federal government agency or state government as part of a civil settlement. On the federal level, the Office of the Inspector General of the Department of Health and Human Services and the Department of Justice are usually involved. A corporate integrity agreement creates a framework within which the company must operate in order to avoid being barred from participation in federal health care programs. Corporate integrity agreements are commonly a part of the government's anti-fraud efforts.

225. On December 16, 2022, Dawn Sorensen, Vice President, Global Legal Affairs, on behalf of Advanced Bionics, LLC and the Office of Inspector General of the Department of Health and Human Services ("Inspector General") entered into a Corporate Integrity Agreement. See Exhibit 4.

226. On December 16, 2022, AB and the Inspector General entered into the

Corporate Integrity Agreement to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs and with the statutes, regulations, and written directives of the FDA. The Corporate Integrity Agreement has a term of five years.

227. The Corporate Integrity Agreement required AB to implement training programs for its board members and employees, to implement a compliance program to meet FDA requirements, and provided for Stipulated Penalties, up to $50,000, for violations of the Corporate Integrity Agreement, among other things.

228. The Corporate Integrity Agreement required an Independent Review Organization ("IRO") to review AB's systems, processes, policies, and procedures that it uses or follows in connection with performance standards related to Premarket Approvals including (a) the individuals, departments, or groups authorized to approve the selection of performance standards to be used in connection with a Government Reimbursed Product or to approve policies and procedures relating to performance standards; (b) the information and factors to be considered in connection with the selection of performance standards and the establishment of performance standards policies and procedures and (c) the types and sources of information (both internal and external) used to make decisions about performance standards.

229. The IRO was also to identify configurations, results, and descriptions of tests of Government Reimbursed Product against the applicable performance standards, evaluate whether the testing was conducted in a manner consistent with Advanced Bionics LLC's Policies and Procedures including whether all required approvals were obtained, whether the decision making process was consistent with Advanced Bionics LLC's Policies and Procedures, and whether all required documentation pertaining to performance standards testing was retained.

230. The IRO was also to verify that the documentation pertaining to performance standards testing maintained by AB is consistent with the documentation

of performance standards testing submitted to the FDA.

231. Contemporaneously with the Corporate Integrity Agreement, AB was entering into a Settlement Agreement with the United States.

232. On December 20, 2022, the U.S. Attorney's Office for the Eastern District of Pennsylvania issued a press release stating:

> **Advanced Bionics LLC to Pay United States $11.36 Million to Resolve FCA Allegations Related to Cochlear Implant Processors**
> PHILADELPHIA - Advanced Bionics LLC, a Valencia, California, based manufacturer of cochlear implant systems, will pay $11.36 million to resolve alleged False Claims Act violations for misleading federal healthcare programs regarding the radio-frequency (RF) emissions generated by some of its cochlear implant processors. The settlement was announced today by United States Attorney Jacqueline C. Romero and the Justice Department. The settlement resolves allegations that Advanced Bionics, in submitting pre-market approval applications to the U.S. Food and Drug Administration (FDA) for its Neptune and Naida cochlear implant processors, made false claims regarding the results of its RF emissions tests. These tests measure the extent to which cochlear implant systems generate RF emissions that can interfere with other devices that use the RF spectrum - such as mobile phones, alarm and security systems, televisions and radios. According to the allegations, Advanced Bionics represented that its processors satisfied an internationally recognized emissions standard when, in fact, they did not. More specifically, Advanced Bionics is alleged to have manipulated testing conditions to obtain passing test results by not testing processors in "worst-case" configurations, and improperly shielding certain emissions-generating components of the cochlear implant system during emissions testing - all contrary to the standard's requirements. "The FDA's approval process requires companies to demonstrate the efficacy of their products," said U.S. Attorney Romero. "The settlement in this case demonstrates our commitment to hold responsible any medical device manufacturer that skirts these rules and seeks FDA approval of a device it knows is not as effective as represented. The consumers who use these devices, and the federal programs that pay for many of them, deserve better." "The United States expects device manufacturers to provide accurate information when they claim that their devices meet certain tests or

standards," said Principal Deputy Assistant Attorney General Brian M. Boynton, head of the Department of Justice's Civil Division. "The integrity of our health care system depends on the government being able to rely on the information provided by manufacturers when they apply for permission to market their devices." Patients deserve to receive medical devices which are in compliance with all federal standards," said Maureen R. Dixon, Special Agent in Charge, Office of the Inspector General, Department of Health and Human Services (HHS-OIG). "Manufacturers are required to be truthful in submitting claims for payment to the Medicare and Medicaid Programs. HHS-OIG will continue to work with DOJ and our law enforcement partners to protect the integrity of the Medicare Trust Fund." "The VA OIG is dedicated to ensuring veterans receive the healthcare products that the VA promised," said Special Agent in Charge Christopher Algieri of the Department of Veterans Affairs Office of Inspector General's Northeast Field Office. "In reaching today's settlement, we thank the U.S. Attorney's Office and our law enforcement partners in exposing misleading practices that affect medical devices meant for veterans and the proper use of VA dollars for their benefit." "The Department of Defense Office of the Inspector General's Defense Criminal Investigative Service (DCIS) is committed to working with its law enforcement partners and the U.S. Attorney's Office, Eastern District of Pennsylvania to combat healthcare fraud," stated Special Agent in Charge Patrick J. Hegarty, DCIS Northeast Field Office. "TRICARE, the health care program for active-duty military personnel, retirees, and dependents, relies on medical providers to furnish complete and truthful information about the efficacy of their products and services. Today's settlement demonstrates DCIS's tireless commitment to investigating the submission of false claims and statements to TRICARE." "We expect that medical products offered to federal employees and their families meet the standards promised by the manufacturer," said Amy K. Parker, Special Agent in Charge, Office of Personnel Management (OPM) OIG. "We applaud our law enforcement partners and colleagues at the Department of Justice for their hard work resulting in today's settlement." As a result of today's settlement, in addition to the $11.36 million paid to the United States, Advanced Bionics will pay state Medicaid programs $1,238,580. The Medicaid program is funded jointly by the federal and state governments. In addition to the civil settlement, Advanced Bionics entered into a five-year Corporate Integrity Agreement (CIA) with the HHS-OIG. The CIA requires an independent review of activities and processes relating to the

> preparation or submission of Premarket Approval Applications (PMAs) to the FDA and performance standards relevant to those PMAs. Advanced Bionics must also implement a robust compliance program that includes, among other things, a risk assessment program and compliance certifications from key managers and from the Board of Directors. The settlement resolves a lawsuit originally brought by David Nyberg, a former Advanced Bionics engineer, under the whistleblower, or qui tam, provisions of the False Claims Act. The Act permits private citizens with knowledge of fraud against the government to bring a lawsuit on behalf of the United States and to share in any recovery. Nyberg will receive approximately $1.87 million of the federal settlement. The government's pursuit of these matters illustrates the government's emphasis on combating healthcare fraud. One of the most powerful tools in this effort is the False Claims Act.

233. Despite the foregoing and, although AB knew of the failure of its Processors to pass testing intended to prevent RF emitting devices from causing interference to nearby electronic devices, and to protect the public from the effects of such harmful interference, it still marketed, promoted and sold its Processors to the public, including the Plaintiffs Tina and Brian and the Class members, and fraudulently represented that the Processors were compliant with FDA, FCC and other applicable laws and regulations.

## XI. Defendant Never Properly Obtained Premarket Approval for the Processors.

234. Defendant failed to disclose to purchasers and users of its Processors, including the Plaintiffs, that they did not, and could not meet the required standards set by regulatory agencies such as the FDA and FCC, and thus were not fit for use by members of the public. Had Plaintiffs Tina and Brian known that AB had deliberately manipulated the results of its RF energy tests, and that its devices emitted more RF energy than devices that had actually passed such tests, they would not have agreed to purchase Grant's faulty and noncompliant Processor.

235. Grant also suffered from the emotional distress of having a non-compliant Processor, especially because the failure relates to the radiation of RF

energy and the negative effects that such radiation can have on other devices used in daily life.

236. Plaintiffs, like other members of the Class, suffered economic harm in the form of the purchase price of the device, as well as emotional distress, stress and anxiety as a result of Defendant's non-compliant adulterated medical devices.

## CLASS ALLEGATIONS

237. Plaintiffs bring this action on their own behalf and on behalf of a Class, pursuant to Cal. Code Civ. Proc. § 382, Cal. Civ. Code § 1781, and Cal. Bus. & Prof. Code § 17203, defined as follows:

**Class:** All purchasers or users of Defendant's Neptune processors, or Naida Q30, Q70, or Q90 processors, including consumers who paid out-of-pocket, through health insurance, or through any other collateral source within the applicable limitations period.

238. Excluded from the Class are any members of the judiciary assigned to preside over this matter; any officer or director of Defendants; and any immediate family member of such officers or directors.

239. Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Class.

240. Predominance & Superiority: Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

241. Final Declaratory or Injunctive Relief: Defendant has acted and failed to act on grounds generally applicable to the Plaintiffs and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

242. Typicality: The factual and legal bases of Defendant's liability to Plaintiffs and to the other Class members are the same, resulting in injury to the Plaintiffs and to all of the other members of the Class. Plaintiffs and the other members of the Class have suffered harm and damages as a result of Defendant's unlawful and wrongful conduct. Plaintiffs' claims are typical of the claims of the members of the Class Plaintiffs seek to represent, because the factual and legal bases of Defendants' liability to Plaintiffs and the other members are the same, and because Defendants' conduct has resulted in similar injuries to Plaintiffs and to the Class.

243. Numerosity: Upon information and belief, there are hundreds, if not thousands, of Class members such that joinder of all members is impracticable. Although the exact number of members of the Class are currently unknown to Plaintiffs, the members can be easily identified through Defendants' records.

244. Commonality: There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not limited to, the following:

a. Whether Defendant's Processors exceed regulatory limits for RF energy emission;

b. Whether Defendant disclosed the truth regarding the compliance of the Processors with regulatory standards and requirements;

c. Whether Defendant's advertising and representations relating to the Processors constitutes fraud;

d. Whether Defendant's failure to inform its customers regarding the levels of RF energy emitted from the Processors constitutes fraud;

e. Whether Defendant's failure to inform its customers about the failure of the Processors to meet applicable RF energy emissions limits in the testing conditions required by regulators constitutes fraud;

f. Whether Defendant's failure to provide accurate information about the Processors directly to patients constitutes fraud;'

g. Whether Plaintiffs and the other Class members were damaged by Defendant's conduct;

h. Whether Plaintiffs and the other Class members are entitled to restitution or other relief.

245. Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitively expensive and would thus have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions in that it conserves the resources of the courts and the litigants and promotes consistency of adjudication.

246. Plaintiffs will adequately represent and protect the interests of the members of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class and have the financial resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class.

247. Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the other members of the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making injunctive or corresponding declaratory relief appropriate for the Class as a whole.

**<u>COUNT ONE</u>**
**Fraudulent Concealment**
**(On behalf of Plaintiffs and the Class)**

248. Plaintiffs hereby incorporate the above allegations by reference as though fully set forth herein.

249. Any applicable statutes of limitation have been tolled by the knowing and active concealment of material facts known by Defendant when Defendant had a duty to disclose those facts. AB's conduct was intentional and meant to mislead Plaintiffs, other Class members and their medical providers.

250. The Processors were not RF compliant and caused radio interference with other devices, including cell phones.

251. Defendant has kept Plaintiffs and the other Class members ignorant of vital information essential to the pursuit of their claims, without any fault of lack of diligence on Plaintiffs' part, for the purpose of obtaining delay on Plaintiffs' part in filing this cause of action.

252. Defendant's fraudulent concealment did result in such delay.

253. Defendant is thus estopped from relying on the statute of limitations defense because it failed to timely disclose, among other things, facts evidencing the defective nature of the Processors.

254. Plaintiffs and the other Class members could not reasonably have discovered the claims made herein within the time allowed to file suit.

255. Defendant was under a continuing duty to disclose the true character, quality and nature of the Processors but concealed them instead. Defendant's conduct set forth herein amounts to conduct purposefully committed, which Defendant must have realized adversely impacted the rights of the Plaintiffs and the other Class members and they suffered damages as a result.

**COUNT TWO**
**Fraud**
**(On behalf of Plaintiffs and the Class)**

256. Plaintiffs hereby incorporate the above allegations by reference as though fully set forth herein.

257. Defendant made misrepresentations of material facts about the Processors or intentionally concealed information about the Processors from Plaintiffs and the other Class members.

258. Defendant possessed (and possesses) superior knowledge about the level and nature of testing of the Processors, including the lack of reliable support for representations about the asserted performance of the Processors.

259. At all times, Defendant acted within the scope of its business operations for its economic and pecuniary gain.

260. Plaintiffs and the other Class members were not able to discover Defendant's superior and specialized knowledge and experience about the Processors including that they failed to comply with requirements relating to RF.

261. Defendant misrepresented to Plaintiffs and the other Class members that the Processors: (1) complied with requirements relating to RF; (2) were merchantable, fit and safe for ordinary use; (3) were fit for their particular purposes and (4) would function properly.

262. For example, Defendant represented to Plaintiffs and the Class members that RF emissions are very low and are not likely to cause any interference in nearby electronic equipment and that the Processors are suitable for use in all establishments, including domestic establishments and those directly connected to the public low-voltage power supply network that supplies buildings used for domestic purposes citing RF Emissions Test CISPR 11, Harmonic Emissions IEC 61000-3-2 and Voltage fluctuations/fiber emissions IEC 61000-3-3.

263. Defendant failed to disclose to Plaintiffs, the other Class members, and

their respective medical providers that: (1) the RF testing that AB performed on the Processors was fraudulent; (2) the Processors were defective because of their failure to comply with applicable RF standards; (3) the Processors would suffer from RF interference preventing them from operating as intended; and (4) the Processors would cause RF interference with other consumer products such as cellular phones and capabilities of other consumers products such as bluetooth preventing them from operating as intended.

264. Defendant's conduct was intentional and meant to mislead the Plaintiffs, the other Class members, and their medical providers.

265. Defendant's conduct was meant to prevent the Plaintiffs, the other Class members, and their medical providers from learning that the Processors did not comply with RF requirements and would cause RF interference.

266. Defendant's representations and omissions were material and made with the intent to persuade and induce Plaintiffs and the other Class members to purchase its Processors.

267. Failure to disclose full information to the Plaintiffs, the other Class members and their medical providers was material because the Processors could not operate as intended when they experienced RF interference and/or caused RF interference with other devices.

268. The Defendant kept its fraudulent conduct concealed from the outside world, including from Plaintiffs and the other Class members, through the fraudulent means described herein.

269. Defendant made the representations and omissions knowing they were false.

270. Plaintiffs and the other Class members justifiably relied upon and were induced to act in reliance on Defendant's misrepresentations or omissions and purchased the Processors based on the misrepresentations or omissions.

271. As a direct and proximate result of the misrepresentations and fraud perpetrated by Defendant regarding the Processors, Plaintiffs and the other Class members suffered damages.

**COUNT THREE**

**Breach of Express Warranty**
**(On behalf of Plaintiffs and the Class)**

272. Plaintiffs hereby incorporate the above allegations by reference as though fully set forth herein.

273. Defendant expressly warranted that the Processors were reasonably fit for their intended purpose for use with its cochlear implant hearing system.

274. The warranties included, without limitation, that (a) the Processors were tested as required; (b) the Processors passed those tests; (c) the Processors complied with RF requirements; and (c) the Processors complied with all requirements imposed by law.

275. Defendant failed to provide adequate warnings to Plaintiffs, other Class members and their medical providers that the Processors did not pass required tests, that the Processors failed to comply with RF requirements and that the Processors failed to comply with all requirements imposed by law.

276. Medical providers would not have prescribed the Processors if they knew the truth.

277. The representations set forth above contained or constituted affirmations of fact or promises made by the Defendant to Plaintiffs and the other Class members which related to the Processors and became part of the basis of the bargain creating an express warranty that the Processors would conform to the affirmations of fact or promises.

278. Plaintiff Grant Gibson and the other Class members were reasonably foreseeable users of the Processors.

279. Defendant's warranties regarding the Processors related to material facts

regarding the safety and efficacy of the Processors.

280. Defendant's warranties were part of the basis of the bargain for the purchase of the Processors by Tina, Brian and the other Class members' purchases of the Processors.

281. Defendant's warranties were untrue.

282. As a direct and proximate result of the breach of the warranties regarding the Processors, Plaintiffs and the other Class members suffered damages.

## COUNT FOUR
**Breach of Implied Warranty**
**(On behalf of Plaintiffs and the Class)**

283. Plaintiffs hereby incorporate the above allegations by reference as though fully set forth herein.

284. Defendant intended that Plaintiff Grant Gibson and the other Class members use the Processors in the manner that Plaintiff Grant Gibson and the other Class members used them.

285. Defendant impliedly warranted the Processors were of merchantable quality, safe and fit for the use for which Defendant intended and Plaintiff Grant Gibson and the other Class members used them.

286. Plaintiff Grant Gibson and the other Class members were foreseeable users of the Processors.

287. Defendant expected the Processors to reach and they did in fact reach consumers, including Plaintiffs and other Class members, without substantial change in the condition in which they were manufactured and sold by Defendant.

288. Defendant breached various implied warranties with respect to the Processors by representing through its labeling, advertising, marketing materials, publications, and regulatory submissions that the Processors complied with all requirements imposed by law, including as they relate to RF emissions.

289. However, the Processors, including the Plaintiff's, suffered from RF

interference preventing them from operating as intended and the Processors, including the Plaintiff's, caused RF interference with other consumer products such as cellular phones and capabilities of other consumers products such as bluetooth preventing them from operating as intended. Grant's processor and the other Class members' Processors caused their cell phones to drop calls and interfered with other radio transmitters.

290. Grant's processor and the other Class members' Processors failed to perform as expected and as represented by Defendant.

291. In reliance upon Defendant's implied warranty, Plaintiff Grant Gibson and the other Class members used the Processor in the foreseeable manner normally intended, recommended, promoted and marketed by Defendant.

292. The Processors are not of merchantable quality, in that they do not meet requirements relating to RF.

293. Defendant breached its implied warranty to Plaintiffs and the other Class members because the Processors are defective and unfit for their ordinary purposes and are not of merchantable quality, safe or fit for their intended use, were not adequately tested and are adulterated.

294. As a direct and proximate result of the falsity of the warranties implicated by Defendant's actions and omissions, Plaintiffs and the other Class members have suffered damages.

**<u>COUNT FIVE</u>**
**Breach of Contract**
**(On behalf of Plaintiff Tina Gibson, Brian Gibson and the Class)**

295. Plaintiffs Tina and Brian hereby incorporate the above allegations by reference as though fully set forth herein.

296. Plaintiffs Tina, Brian and the other Class members agreed to and did purchase the Processors from Defendant for money paid.

297. Defendant agreed to sell Processors that were not adulterated or

misbranded to the Plaintiffs Tina, Brian and the other Class members.

298. The Defendant breached the contract with Plaintiffs Tina, Brian and the other Class members when it sold them Processors that were adulterated and misbranded and in violation of requirements related to RF.

299. The Defendant sold Plaintiffs Tina, Brian and the other Class members adulterated and misbranded Processors.

300. As alleged herein, Defendant's actions, inactions and failures concerning the RF of the Processors and the fraudulent testing relating to the same breached the contract.

301. The Processors, including the processor purchased by Plaintiffs, suffered from RF interference preventing them from operating as intended and the Processors, including the processor purchased by Plaintiffs, caused RF interference with other consumer products such as cellular phones and capabilities of other consumers products such as bluetooth preventing them from operating as intended and breached the contract.

302. Plaintiffs Tina, Brian and the other Class members would not have purchased the Processors from the Defendant if they had known the true facts as set forth herein.

303. Plaintiffs Tina, Brian and the other Class members performed their obligations under their respective contracts for their purchase of the Processors.

304. The Defendant's breach proximately caused the Plaintiffs and the other Class members to suffer damages.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, request the following relief:

1. An order certifying this action as a class action, defining the Class as requested herein, appointing Plaintiffs as class representatives and their counsel as

Class counsel;

2. Awarding Plaintiffs and the members of the Class all punitive, economic, monetary, actual, consequential, and compensatory damages available at law;

3. Awarding Plaintiffs' counsel attorney's fees and costs;

4. Awarding pre and post-judgment interest, as allowable by law;

5. Such further relief as the Court deems reasonable and just.

## JURY DEMAND

Plaintiffs request trial by jury of all claims and issues that can be so tried.

DATED: March 13, 2025

Respectfully submitted,

GRANT GIBSON, TINA GIBSON and BRIAN GIBSON individually and on behalf of similarly situated individuals

By: /s/ *Eugene Y. Turin*
One of Plaintiffs' Attorneys

Eugene Y. Turin (SB # 342413)
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002 Ex. 3
Fax: 312-275-7895
eturin@mcgpc.com

*Attorneys for Plaintiffs and the Putative Class*

# Exhibit 1

FDA



# Class 2 Device Recall HiResolution" Bionic Ear System



## Class 2 Device Recall HiResolution" Bionic Ear System

| | |
|---|---|
| **Date Initiated by Firm** | February 17, 2020 |
| **Create Date** | May 15, 2020 |
| **Recall Status**[1] | Terminated [3] on January 26, 2023 |
| **Recall Number** | Z-2032-2020 |
| **Recall Event ID** | 85141[23] |
| **PMA Number** | P960058[24] |
| **Product Classification** | Implant, cochlear[25] - **Product Code** MCM[26] |
| **Product** | AB HiResolution Bionic Ear System, HiRes Ultra 3D CI, HiFocus SlimJ Electrode - Product Usage: The device is intended to restore a level of auditory sensation to patients with profound sensorineural deafness via electrical stimulation of the auditory nerve. |
| **Code Information** | Model Numbers: CI 1601 04 - HiRes Ultra 3D with HF Mid-Scala Electrode CI 1601 05 - HiRes Ultra 3D with HF SlimJ Electrode Lot Numbers - 1000000 thru 1999999. |
| **Recalling Firm/ Manufacturer** | Advanced Bionics, LLC<br>28515 Westinghouse Pl<br>Valencia CA 91355-1398 |
| **For Additional Information Contact** | 800-678-2575 |
| **Manufacturer Reason for Recall** | hearing performance degradation due to body-fluid entering the device. |

| | |
|---|---|
| **FDA Determined Cause** [2] | Device Design |
| **Action** | On 02/17/2020, the firm sent an "Urgent Field Action Notification" via email to healthcare providers informing them that the firm has detected an increase in the number of devices being explanted or the potential of being explanted due to performance issues (impedance drop and reports of hearing performance degradation) resulting from fluid ingress at the electrode. The Healthcare Notification instructs Healthcare Providers to:<br>1. Provide registration information for all devices that have been implanted;<br>2. Return any unimplanted devices and to emphasize not to implant any of these units.<br>The Healthcare Provider Notification also provided the Healthcare Provider with a Patient Management information that includes "Key Clinical Questions".<br><br>For questions, contact the Recalling Firm at:<br>In the United States: (877) 829□0026 between the hours of 5:00 AM and 5:00 PM Pacific Time, Monday through Friday.<br><br>Europe / Asia Pacific / Latin America / Middle East and Africa: Please contact your local Advanced Bionics office with any questions.<br><br>On 02/17/2020, the firm sent an "Important Notification" to implant receipients via FedEx to inform implant users or parents/caregivers of the issue of prolonged hearing degradation due to physiological fluid entering into the electrode (not the hermetic seal of the device body) and causing interruption of stimulation that can negatively affect device performance. The notification also informed users that the firm, as a precaution, is removing from the market all the initial version of unimplanted device and states that the performance degradation does not affect the safety of the device but revision surgery may be necessary due to the performance decrease. The firm is informing patients/users:<br>-They should continue to use your device as normal. If you experience a<br>decrease in hearing performance over time, you should visit your Audiologist to have your hearing assessed to understand if there could be a potential issue with yo |
| **Quantity in Commerce** | 8159 units (CI-1601-04 = 3827 units and CI-1601-05 = 4332 units) |
| **Distribution** | Worldwide distribution - US Nationwide distribution and the countries of Canada, Brazil, Bangladesh, Switzerland, China, Australia, India, South Korea, Thailand, Ecuador, Mexico, El Salvador, Guatemala, Malaysia, Myanmar, Taiwan, Chile, Costa Rica, Colombia, Panama, Japan, Argentina, Peru, Singapore, China, New Zealand, Vietnam, Dominican Republic<br><br>Refer to uploaded consignee lists in Associated Documents:<br>Exhibit 05_ConsigneeList_Center_17FEB2020<br>Exhibit 06_ConsigneeList_Professionals_17FEB2020<br>Exhibit 07_ConsigneeList_Patients_17RFEB2020 |
| **Total Product Life Cycle** | TPLC Device Report[27] |

[1] A record in this database is created when a firm initiates a correction or removal action. The record is updated if the FDA identifies a violation and classifies the action as a recall, and it is updated for a final time when the recall is terminated. Learn more about medical device recalls[28].

[2] Per FDA policy, recall cause determinations are subject to modification up to the point of termination of the recall.

[3] For details about termination of a recall see Code of Federal Regulations (CFR) Title 21 §7.55[29].

**PMA Database** PMAs with Product Code = MCM and Original Applicant = ADVANCED BIONICS[30]

---

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. https://www.fda.gov/
4. http://www.fda.gov/MedicalDevices/default.htm
5. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/default.htm
6. /scripts/cdrh/devicesatfda/index.cfm
7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm
8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm
9. /scripts/cdrh/cfdocs/cfRL/rl.cfm
10. /scripts/cdrh/cfdocs/cfMAUDE/TextSearch.cfm
11. /scripts/cdrh/cfdocs/cfRES/res.cfm
12. /scripts/cdrh/cfdocs/cfPMA/pma.cfm
13. /scripts/cdrh/cfdocs/cfHDE/hde.cfm
14. /scripts/cdrh/cfdocs/cfPCD/classification.cfm
15. /scripts/cdrh/cfdocs/cfStandards/search.cfm
16. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm
17. /scripts/cdrh/cfdocs/cfPCD_RH/classification.cfm
18. /scripts/cdrh/cfdocs/cfAssem/assembler.cfm
19. /scripts/cdrh/cfdocs/Medsun/searchReportText.cfm
20. /scripts/cdrh/cfdocs/cfClia/Search.cfm
21. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm
22. http://www.fda.gov/safety/recalls/enforcementreports/default.htm
23. /scripts/cdrh/cfdocs/cfRES/res.cfm?start_search=1&event_id=85141
24. /scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P960058
25. /scripts/cdrh/cfdocs/cfPCD/classification.cfm?ID=MCM
26. /scripts/cdrh/cfdocs/cfPCD/classification.cfm?ID=MCM
27. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm?id=MCM
28. http://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm329946.htm

29. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm?fr=7.55
30. /scripts/cdrh/cfdocs/cfPMA/pma.cfm?start_search=1&productcode=MCM&applicant=ADVANCED%20BIONICS

Page Last Updated: 07/18/2024

Note: If you need help accessing information in different file formats, see Instructions for Downloading Viewers and Players.

Language Assistance Available: Español | 繁體中文 | Tiếng Việt | 한국어 | Tagalog | Русский | العربية | Kreyòl Ayisyen | Français | Polski | Português | Italiano | Deutsch | 日本語 | فارسی | English

Accessibility Contact FDA Careers FDA Basics FOIA No FEAR Act Nondiscrimination Website Policies / Privacy

FDA

U.S. Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993
Ph. 1-888-INFO-FDA (1-888-463-6332)
Contact FDA

USA.gov

For Government For Press

Combination Products Advisory Committees Science & Research Regulatory Information Safety Emergency Preparedness International Programs News & Events Training and Continuing Education Inspections/Compliance State & Local Officials Consumers Industry Health Professionals FDA Archive Vulnerability Disclosure Policy

U.S. Department of Health & Human Services

**Links on this page:**

1. http://www.addthis.com/bookmark.php?u508=true&v=152&username=fdamain
2. http://www.addthis.com/bookmark.php
3. https://www.fda.gov/
4. http://www.fda.gov/MedicalDevices/default.htm
5. http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Databases/default.htm
6. /scripts/cdrh/devicesatfda/index.cfm
7. /scripts/cdrh/cfdocs/cfPMN/pmn.cfm
8. /scripts/cdrh/cfdocs/cfpmn/denovo.cfm
9. /scripts/cdrh/cfdocs/cfRL/rl.cfm
10. /scripts/cdrh/cfdocs/cfMAUDE/TextSearch.cfm
11. /scripts/cdrh/cfdocs/cfRES/res.cfm
12. /scripts/cdrh/cfdocs/cfPMA/pma.cfm
13. /scripts/cdrh/cfdocs/cfHDE/hde.cfm
14. /scripts/cdrh/cfdocs/cfPCD/classification.cfm
15. /scripts/cdrh/cfdocs/cfStandards/search.cfm
16. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm
17. /scripts/cdrh/cfdocs/cfPCD_RH/classification.cfm
18. /scripts/cdrh/cfdocs/cfAssem/assembler.cfm
19. /scripts/cdrh/cfdocs/Medsun/searchReportText.cfm
20. /scripts/cdrh/cfdocs/cfClia/Search.cfm

21. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm

22. http://www.fda.gov/safety/recalls/enforcementreports/default.htm

23. /scripts/cdrh/cfdocs/cfRES/res.cfm?start_search=1&event_id=85141

24. /scripts/cdrh/cfdocs/cfpma/pma.cfm?ID=P960058

25. /scripts/cdrh/cfdocs/cfPCD/classification.cfm?ID=MCM

26. /scripts/cdrh/cfdocs/cfPCD/classification.cfm?ID=MCM

27. /scripts/cdrh/cfdocs/cfTPLC/tplc.cfm?id=MCM

28. http://www.fda.gov/MedicalDevices/Safety/ListofRecalls/ucm329946.htm

29. /scripts/cdrh/cfdocs/cfCFR/CFRSearch.cfm?fr=7.55

30. /scripts/cdrh/cfdocs/cfPMA/pma.cfm?
start_search=1&productcode=MCM&applicant=ADVANCED%20BIONICS

sonova
HEAR THE WORLD

# Media Release

## AB initiates voluntary field corrective action
## – Strong performance of the Hearing Instruments business

***Stäfa (Switzerland), February 18, 2020*** **– Sonova Holding AG, a leading provider of hearing solutions, informs of a voluntary field corrective action by its US subsidiary Advanced Bionics LLC (AB). AB has notified relevant regulatory bodies that it will retrieve un-implanted devices of the initial version of HiRes Ultra and Ultra 3D cochlear implant devices, which are currently superseded by a recently approved new version of the devices. The voluntary field corrective action is expected to temporarily affect the sales and earnings development of AB during the deployment of the new version of the product.**

**Further, Sonova is pleased to announce that the Hearing Instruments business has developed stronger than expected following the publication of the half-year report. Reflecting the strong performance of the Hearing Instruments business and despite the temporary negative effects of the voluntary field corrective action of AB, Sonova raises its outlook for FY 2019/20. The Group now expects sales to grow by 9-11% (from 8%-10%) and the adjusted EBITA to rise between 14%-17% (from 12%-15%), both measured in local currencies. This excludes one-time costs that are currently estimated in the range of CHF 40-50 million, related to the voluntary field corrective action of AB.**

**AB initiates voluntary field corrective action – New implant version currently rolled out**
Upon observing reports of decreased hearing performance of a limited number of HiRes Ultra and Ultra 3D cochlear implant devices and reflecting AB's efforts to continually enhance its products, improvements were developed with the help of independent health care practitioners. The new version of the device recently received regulatory approvals in major markets and is currently rolled out based on availability.

However, in an abundance of caution, AB will initiate a voluntary field corrective action relating to the HiRes Ultra and Ultra 3D cochlear implant devices, which includes the retrieval of un-implanted devices without those improvements as well as further appropriate steps. This is in response to AB's quality system which recorded recent increases in the number of explants of devices, related to lower impedances and reports of decreased hearing performance. To date, less than 0.5% of recipients have been explanted and, based on AB's quality system monitoring, the vast majority of HiRes Ultra and Ultra 3D implants continue to function properly. This situation does not present a device related safety issue to the recipients.

Sonova Holding AG
Laubisrütistrasse 28
8712 Stäfa
Switzerland

Phone +41 58 928 33 33
Fax +41 58 928 33 45
info@sonova.com
www.sonova.com

**Strong development of the Hearing Instruments business**
Since the publication of the results for the first half of FY 2019/20, Sonova's Hearing Instruments business has developed stronger than expected. The business achieved continued strong growth across key markets despite a more challenging comparison base after the anniversary of the Phonak Marvel launch at the end of November. This was driven by the success of new solutions and features introduced with Marvel 2.0 in August 2019. In addition, the increased investments into the sales coverage and marketing capabilities initiated during the first half of FY 2019/20 supported growth in the second half. A key highlight was the US, where Sonova expanded its market share across channels, driven by a further expansion of its leading position with the US Department of Veterans Affairs (VA), a new private label contract with a large US retailer and strong growth in the independent channel. Sonova thus expects the result of the Hearing Instruments business to exceed previous expectations.

**Updated outlook 2019/20**
In light of the strong development of the Hearing Instruments business and despite the temporary negative effects of the voluntary field corrective action of AB, Sonova raises the outlook for FY 2019/20. The Group now expects sales to grow by 9%-11% (from 8%-10%) and the adjusted EBITA to rise between 14%-17% (from 12%-15%), both measured in local currencies. The outlook for adjusted EBITA growth excludes one-time costs that are currently estimated in the range of CHF 40-50 million, related to the voluntary field corrective action of AB. As a consequence of the strengthening of the Swiss franc and based on current exchange rates, Sonova anticipates reported sales growth to be reduced by around 3 percentage points and the adjusted EBITA growth in Swiss francs to be negatively affected by around 6 percentage points in FY 2019/20. In reported Swiss francs, this implies an increase in sales between 6%-8% and a rise in the adjusted EBITA between 8%-11%.

Due to the outbreak of the novel coronavirus (COVID-19), Sonova's operations in China resumed their activities after the Chinese New Year one week later than previously planned. At this time, this is not expected to materially impact Sonova's results.

Arnd Kaldowski, CEO of Sonova, says: "While the voluntary field corrective action announced today is disappointing, it demonstrates our continued commitment to put patients first. Our Cochlear Implants business is an important element of our ambition to provide a solution for every type of hearing loss and we are confident about the potential for the business going forward. I am very happy about the continued strong development of our Hearing Instruments business and the overall sales and profitability development of the Group, clearly demonstrating the success of our strategy."

**Conference call**
Sonova will host a conference call for members of the media, today, February 18, 2020, at 09.30 AM CET to discuss today's announcement.

**The conference call can be accessed at:**
+41 (0) 58 310 50 00 (Europa)
+44 (0) 207 107 06 13 (UK)
+1 (1) 631 570 56 13 (USA)

– End –

**Contacts:**

**Investor Relations**

Thomas Bernhardsgrütter
Phone +41 58 928 33 44
Mobile +41 79 618 28 07
Email thomas.bernhardsgruetter@sonova.com

**Media Relations**

Patrick Lehn
Telefon +41 58 928 33 23
Mobil +41 79 410 82 84
E-Mail patrick.lehn@sonova.com

**Disclaimer**
This Media Release contains forward-looking statements, which offer no guarantee with regard to future performance. These statements are made on the basis of management's views and assumptions regarding future events and business performance at the time the statements are made. They are subject to risks and uncertainties including, but not confined to, future global economic conditions, exchange rates, legal provisions, market conditions, activities by competitors and other factors outside Sonova's control. Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, actual outcomes may vary materially from those forecasted or expected. Each forward-looking statement speaks only as of the date of the particular statement, and Sonova undertakes no obligation to publicly update or revise any forward-looking statements, except as required by law.

**About Sonova**
Sonova, headquartered in Stäfa, Switzerland, is a leading provider of innovative hearing care solutions. The Group operates through its core business brands Phonak, Unitron, Hansaton, Advanced Bionics and AudioNova. Sonova offers its customers one of the most comprehensive product portfolios in the industry – from hearing instruments to cochlear implants to wireless communication solutions.

Pursuing a unique vertically integrated business strategy, the Group operates through three core businesses – hearing instruments, audiological care and cochlear implants – along the entire value chain of the hearing care market. The Group's sales and distribution network, the widest in the industry, comprises over 50 own wholesale companies and more than 100 independent distributors. This is complemented by Sonova's audiological care business, which offers professional audiological services through a network of around 3,500 locations in 19 key markets.

Founded in 1947, the Group has a workforce of over 14,000 dedicated employees and generated sales of CHF 2.76 billion in the financial year 2018/19 as well as a net profit of CHF 460 million. Across all businesses, and by supporting the Hear the World Foundation, Sonova pursues its vision of a world where everyone enjoys the delight of hearing and therefore lives a life without limitations.

For more information please visit www.sonova.com and www.hear-the-world.com.

Sonova shares (ticker symbol: SOON, Security no: 1254978, ISIN: CH0012549785) have been listed on the SIX Swiss Exchange since 1994. **The securities of Sonova have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "U.S. Securities Act"), or under the applicable securities laws of any state of the United States of America, and may not be offered or sold in the United States of America except pursuant to an exemption from the registration requirements under the U.S. Securities Act and in compliance with applicable state securities laws, or outside the United States of America to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.**

# Important Notification To HiRes Ultra / HiRes Ultra 3D Cochlear Implant Recipients

*February 21, 2020*

Dear Cochlear Implant User or Parent / Caregiver,

The purpose of this letter is to provide you with information about a device issue with the HiRes Ultra / HiRes Ultra 3D cochlear implant that could possibly affect the performance of your device. Although the vast majority of Advanced Bionics cochlear implants function properly, we have become aware that some recipients have experienced prolonged hearing degradation due to body fluid entering into the electrode (not the hermetic seal of the implant case) and causing interruption of stimulation that can negatively affect device performance. AB's primary concern is the safety and hearing performance of you, our patients, as well as the reliability of our products. As a precaution, after a recent increase in performance complaints, we initiated on February 18, 2020, a voluntary removal from the market all of the initial versions of unimplanted HiRes Ultra / HiRes Ultra 3D. Please note that this device-related issue may manifest in performance degradation that could require revision surgery. The only potential for patient harm are the risks associated with a surgery.

In keeping with our commitment to our recipients, we are now notifying those already implanted with HiRes Ultra / HiRes Ultra 3D products. Our records indicate that you are one of those recipients.

**What does this mean for you?**
You should continue to use your device as normal. If you or the person you care for experience a decrease in hearing performance over time, you should visit your Audiologist to have your hearing assessed to understand if there could be a potential issue with your cochlear implant.

**What are the signs and symptoms that HiRes Ultra / HiRes Ultra 3D might have an issue?**
You or your child may experience:

- Hearing performance degradation over time
- Reduced ability to hear high pitched sounds (For example, "f" or "s" sounds)
- Young children or non-verbal recipients may not respond consistently to high pitched sounds

**What should I do if I or my child has any of these signs of symptoms?**

1. Schedule an appointment with your Audiologist to have your hearing assessed.
2. If it is found that your hearing has decreased your Audiologist will try to reprogram your device to resolve the issue.
3. If reprogramming is not successful, your device will be tested to see if it is working properly.

**Do I need to do anything if I don't have these signs or symptoms?**
No, not at this time. We work with Physicians and Audiologists to track device reliability and the vast majority of devices function properly.

In the event that your implant is subject to this issue, Advanced Bionics will provide a replacement device free of charge that incorporates several improvements to specifically address this issue. If you have any questions regarding this letter, please contact your local Advanced Bionics Bionics representative, or our customer service department at 877.829.0026, CustomerService@advancedbionics.com (mailto:Customerservice@advancedbionics.com). We are fully committed to providing you with support, information, and innovation to help improve hearing outcomes today and tomorrow.

Sincerely,

Victoria E. Carr-Brendel, Ph.D.
President/GVP Cochlear Implants
Advanced Bionics
28515 Westinghouse Place
Valencia, CA 91355 USA

**If you have questions, please reach out to us at:**

Norway Change Country NO (HTTPS://WWW.ADVANCEDBIONICS.COM/NO/NO/FIELD-ACTION.HTML)

ADVANCED BIONICS

Advanced Bionics LLC
28515 Westinghouse Place
Valencia, CA 91355, United States

T: +1.877.829.0026
T: +1.661.362.1400
F: +1.661.362.1500

CustomerService@advancedbionics.com (mailto:CustomerService@advancedbionics.com)

## About Us

About AB (https://www.advancedbionics.com/com/en/home/about-us/about-ab.html)

Careers (https://www.advancedbionics.com/com/en/home/about-us/careers.html)

Phonak + AB (https://www.advancedbionics.com/com/en/home/about-us/phonak-ab.html)

Life Without Limits (https://www.advancedbionics.com/com/en/home/about-us/corporate-information.html)

History (https://www.advancedbionics.com/com/en/home/about-us/history.html)

Global Distributors (https://www.advancedbionics.com/com/en/home/about-us/global-distributors.html)

AB Global Offices (https://www.advancedbionics.com/com/en/home/about-us/ab-global-offices.html)

(https://www.advancedbionics.com/com/en/home/about-us/contact-us.html)

Newsroom (https://www.advancedbionics.com/com/en/home/about-us/newsroom.html)

## Related Sites

HearingJourney (http://www.hearingjourney.com)

HearingSuccess Rehab Resources (http://hearingsuccess.com/)

## Tools

Find a Clinic (https://www.advancedbionics.com/com/en/home/about-cochlear-implants/find-a-clinic.html)

Sitemap (https://www.advancedbionics.com/com/en/system/sitemap.html)

MRI Safety Information (https://www.advancedbionics.com/com/en/portals/professional-portal/products/mri-safety-information.html)

IFUs (https://www.advancedbionics.com/ifu/en/no.html)

## Legal

Terms of Use (https://www.advancedbionics.com/com/en/footer/legal/terms-of-use.html)

Privacy Policy (https://www.advancedbionics.com/com/en/footer/legal/privacy-policy.html)

Social Media Governance (https://www.advancedbionics.com/com/en/footer/legal/social-media-governance.html)

Cookie Policy (https://www.advancedbionics.com/com/en/footer/legal/cookie-policy.html)

AB – A Sonova Brand

Copyright © 2024 Advanced Bionics AG and affiliates. All rights reserved.

Advanced Bionics

A Sonova brand

*October 31, 2022*

## An update to the Voluntary Field Corrective Action of HiRes Ultra and Ultra 3D

Valencia, CA, Oct. 31, 2022 – Advanced Bionics (AB), a global leader in developing advanced cochlear implant systems, is providing this update on the field corrective action related to the initial version of HiRes Ultra and Ultra 3D cochlear implant devices due to a decrease in performance experienced by a portion of its recipients.

As a follow up to our February 2020 communication regarding the HiRes Ultra / HiRes Ultra 3D cochlear implant field action, we would like to update our recipients on the monitoring of the field action, as well as the performance of the newest version of the Ultra implant that replaced the original version.

As a reminder, this voluntary field action was performed in response to observed changes in device function and recipient hearing performance. The issue was identified as fluid impacting the implant electrode, resulting in an interruption of stimulation and degraded performance. While this issue does not lead to recipient injury, it may require revision surgery.

The key indicators of a device-related issue are decreased hearing performance, specifically decreased audibility, distorted loudness perception, speech clarity, and general responsiveness to sound. Recipients experiencing any of these symptoms should contact their audiologist or other healthcare provider.

As of April 5, 2022, the global rate of explant of the original version of the HiRes Ultra / HiRes Ultra 3D implant associated with this performance issue is 11.3% of the devices implanted. Advanced Bionics will continue to track the performance of original HiRes Ultra / Ultra 3D implant.

In response to early indications of the original Ultra / Ultra 3D implant performance issue, AB made device improvements to protect against fluid impacting the electrode. This improved device, known as "version 2," has been implanted more than 14,000 times as of April 5, 2022. To date, the "version 2" device has performed at a much higher reliability level than the original design, with only one (1) of the version 2 devices explanted for performance issues similar to the now-recalled version 1 of the device as of the April date. This suggests that the "version 2" of Ultra effectively addresses the issue seen in the original design.

We continue to monitor this issue vigilantly and will continue to make updated information available. We encourage recipients to contact their local Advanced Bionics representative with any questions. AB recognizes that this issue is disruptive to the lives of recipients who have experienced related issues with their devices. We are committed to the design and manufacture of high-quality products and will work to maintain recipient confidence in our company and our products.

Advanced Bionics LLC • 28515 Westinghouse Place, Valencia, CA 91355, USA

T: +1.877.829.0026 • T: +1.661.362.1400 • F: +1.661.362.1500 • info.us@AdvancedBionics.com www.AdvancedBionics.com

# Exhibit 2

*The Laryngoscope*
© 2022 The Authors. *The Laryngoscope* published by Wiley Periodicals LLC on behalf of The American Laryngological, Rhinological and Otological Society, Inc.

15314995, 2022, 0, Downloaded from https://onlinelibrary.wiley.com. By Readcube-Labtiva- on [23/05/2022]. Re-use and distribution is strictly not permitted, except for Open Access articles

# Advanced Bionics HiRes Ultra and Ultra 3D Series Cochlear Implant Recall: Time Course of Anomalies

Lutz Gärtner, PhD; Thomas Lenarz, MD

**Objectives:** To estimate median survival time until the appearance of anomalies indicating a potential implant failure associated with fluid ingress in implanted cochlear implant (CI) devices of the initial version of Advanced Bionics HiRes Ultra and HiRes Ultra 3D series.

**Study Design:** Retrospective review.

**Methods:** Cochlear implantation was performed in a standard fashion. Implant integrity was tested at follow-up visits by measuring impedance and electrically evoked compound action potential (ECAP). Additional tests such as electrical field imaging (EFI) were conducted by the manufacturer. Based on these tests, the presence or absence of an anomaly was classified.

**Results:** Of the 349 devices implanted at this institution, 181 showed anomalies in accordance with the special failure mode and for this reason, 120 implants were already explanted. The median survival time without anomalies was 1062 days. So far, the suspicion of device failures has been confirmed in all cases in which a post-implantation analysis was already available.

**Conclusions:** Regular tests at the follow-up visits are necessary to monitor the integrity of CIs.

**Key Words:** advanced bionics, cochlear implant, device failure, electrical field imaging (EFI), electrically evoked compound action potential (ECAP), HiRes Ultra, HiRes Ultra 3D, recall, survival time.

**Level of Evidence:** 3

*Laryngoscope*, 00:1–7, 2022

## INTRODUCTION

On February 18, 2020, Advanced Bionics (a brand of Sonova Holding AG, Stäfa, Switzerland) announced a voluntary recall of the initial version (V1) of its "HiRes Ultra" and "HiRes Ultra 3D" cochlear implant (CI) devices.[1] The reason given was that fluid ingress at the electrode has occurred leading to interruption of stimulation, which in turn caused a decrease in performance experienced by a small percentage of recipients.[2] The V1 series can be identified by the serial number, which starts with a "1" followed by six more digits.

At our clinic, anomalies in the affected CI series were first noticed during a follow-up in April 2019 in a HiRes Ultra Mid-Scala implant. On individual electrodes, the impedance dropped, the current level to elicit a comfortable loudness perception (so-called M-level) increased, the amplitude of the electrically evoked compound action potential (ECAP) decreased, and speech recognition was degraded.[3] This is a new pattern specific to this type of failure. Between September 2016 and October 2019, we implanted a total of 349 devices of the V1 series mentioned above. In this retrospective study, the time course of device anomalies and device failures is presented for the whole cohort.

## MATERIALS AND METHODS

### *Ethics Statement*

This publication contains data collected during the clinical routine and is approved by the ethics board of the Hannover Medical School (No. 1897-2013). The ethics board approval covers the evaluation of all data acquired during the clinical routine. The ethics committee waived the requirements for informed consent.

### *Subjects and Implants*

At our clinic, the HiRes Ultra (V1) device was implanted between September 2016 and November 2018, and the HiRes Ultra 3D (V1) device was implanted between November 2018 and October 2019. Age at implantation was between 0.5 and 88.4 years. 74 implants were placed in children under 10 years of age. Figure 1 shows the time course of implantation regarding the type of implant housing ("Ultra" and "Ultra 3D") as well as the type of electrode array ("Mid-Scala" and "SlimJ"). The following numbers of CIs were implanted: Ultra Mid-Scala: 194; Ultra SlimJ: 78; Ultra 3D Mid-Scala: 15; Ultra 3D SlimJ: 62.

### *Surgery*

Cochlear implantation was performed in a standard fashion.[4] A bone bed was drilled to insert the implant. A connecting tunnel to the mastoid was created to insert the electrode. The round window membrane was opened with a sharp cannula.

---

This is an open access article under the terms of the Creative Commons Attribution-NonCommercial License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited and is not used for commercial purposes.

From the Department of Otolaryngology (L.G., T.L.), Hannover Medical School, Hannover, Germany.

Editor's Note: This Manuscript was accepted for publication on April 21, 2022.

The authors have no funding, financial relationships, or conflicts of interest to disclose.

Send correspondence to Lutz Gärtner, PhD, Carl-Neuberg-Str. 1, 30625, Hannover, Germany. E-mail: gaertner.lutz@mh-hannover.de

DOI: 10.1002/lary.30151

15314995, 2022, 0, Downloaded from https://onlinelibrary.wiley.com. By ResearchGate [23/05/2022]. Re-use and distribution is strictly not permitted, except for Open Access articles




Fig. 1. Overview of all cochlear implantations with Advanced Bionics HiRes Ultra and HiRes Ultra 3D devices (initial version, "V1") over time.

The electrode array was inserted atraumatically in a slow procedure. In the case of a Mid-Scala electrode, the manufacturer's electrode insertion tool was used. The electrode carrier was fixed in a bone slit in the posterior tympanostomy.

## *ECAP Measurements*

This measurement proves the electrode-nerve interface and is widely used to support fitting, especially in patients who cannot give sufficient feedback on their auditory perception.[5] During the clinical routine, ECAP was measured utilizing the Neural Response Imaging (NRI) task within the clinical software SoundWave (Advanced Bionics). The patient's audio processor with the coil placed over the implant was connected to a personal computer via the CPI-3 (Clinical Programming Interface) interface box. Default settings (32 averages, cathodic first stimulus, case electrode as a reference, gain factor applied by the recording amplifier: 300) were used.

## *Electrical Field Imaging*

This measurement shows the longitudinal course of the electric field along the electrode array. A stimulus current $I$ is applied on a given electrode contact and the intracochlear potential $U$ is measured on all electrode contacts. To normalize the results, the ratio $U/I$ can be used as a generalized impedance value.[6] Currently, Electrical field imaging (EFI) is not available within the clinical software. However, the manufacturer Advanced Bionics carries out those measurements by using their "Electrical Field Imaging and Modeling Tool" (EFIM), ver. 1.3.11 and since 2020 in addition their "EFI Analysis Tool," ver. 2.5. Results were assessed by both the manufacturer and our staff.

## *Status of the Implanted Device Over Time*

With the appearance of anomalies in several cases, we informed our patients in May 2019 and conducted examinations also in-between the regular follow-ups. In fact, these "V1 screenings" were repeated at each visit and were not limited to patients complaining about sound quality or deteriorated speech comprehension. Impedances, M-levels, and ECAP responses were measured using the clinical software SoundWave. On the same day, the manufacturer Advanced Bionics performed additional measurements, for example, EFI, to detect anomalies of the implant.

We analyzed the EFI measurement results independently of the manufacturer and graded the status $S$ of the implant on this basis. In case of doubt, ECAP measurements were taken into account. Three categories were assigned as follows. S0: no anomaly observable, the EFI pattern did not show any sink, and the electric field seems to decay with distance. S1a: slight anomaly or anomaly on one or two electrode contacts. The EFI pattern shows sinks which may be attributed to interacting channels. S1b: anomaly on several electrode channels that may suggest re-implantation.

## *Integrity Tests by the Manufacturer*

Implanted devices were tested by Advanced Bionics at each follow-up visit. Results were communicated to the clinic staff by so-called "site visit reports" (SVR).

Explanted CIs were returned to Advanced Bionics for examination. The "device failure analysis" (DFA) report, which may take several months to complete, contains details about the type of failure if one was found.

## *Reliability Reporting by the Manufacturer*

The manufacturer's reliability reporting is based on two different standards. The first methodology is in accordance with the international standard ISO 5841-2,[7] the European consensus statement on CI failures and explantations,[8] and the international classification of reliability for implanted CI receiver stimulators.[9] A patient who received the CI below the age of 18 years is regarded as a child. The "cumulative survival rate" (CSR), also labeled "cumulative survival percentage" (CSP), measures the percentage of functioning devices at the given annual time intervals after implantation.

In the United States, a second standard (CI86) was published by the Association for the Advancement of Medical Instrumentation (AAMI).[10] Here, a patient who received the CI below the age of 10 years is regarded as a child. The "cumulative removal percentage" (CRP) measures the percentage of devices that have been removed at given annually time intervals after implantation.

15314995, 2022, 0, Downloaded from https://onlinelibrary.wiley.com. By Readcube-Labtiva- on [23/05/2022]. Re-use and distribution is strictly not permitted, except for Open Access articles

### *Kaplan–Meier Survival Analysis of Implanted Devices With Anomalies*

The new failure pattern, which has been observed with some HiRes Ultra V1 and HiRes Ultra 3D V1 devices, may lead to impaired speech comprehension and deteriorated sound quality, but still allows for auditory perception without intermittencies. Therefore, the failure might be difficult to detect and the necessity for re-implantation could remain unrecognized. Since manufacturer's reliability reports refer to explants only, we were seeking a measure that describes the time course of anomalies, whether they led to explantation or not. Kaplan–Meier survival analysis[11] was used to estimate the probability that an anomaly (status S1a or S1b) can be detected at a given time after surgery. This probability has to be distinguished from the commonly used reliability metrics CSR (or CSP).

Data were analyzed with the software IBM SPSS Statistics 27 (Armonk, NY). The parameter "time" was set as the difference between day of measurement and the day of implantation. The parameter "status" was given a value of "1" in case of any anomaly (S1a or S1b), or a value of "0" when no anomaly (S0) was found. If no anomaly was yet found, "time" refers to the measurement at the last follow-up. The patient is labeled "right-censored" to express, that at this time the device was fully functioning. If an anomaly was found, "time" refers to the day, where the anomaly was detected for the first time. In addition, three subgroups were analyzed separately, which was accomplished by setting the "factor" inside Kaplan–Meier analysis: (I) two-implant housing types (Ultra and Ultra 3D) were included; (II) two electrode types (Mid-Scala and SlimJ) were included; (III) two groups of implantees, referring to their age at implantation (adults ≥10 years, children <10 years) were included. Median survival time was estimated as the 50th percentile of the survival function. Log-rank (Mantel-Cox) test was performed for pairwise comparison within different subgroups.

## RESULTS

The following analysis refers to 349 V1 series devices implanted only in our clinic. The first V1 was explanted in August 2017 for medical reasons due to wound healing disorder in a young child. The second V1 was explanted in April 2018 due to lacking ECAP responses on several electrode contacts in a young child. In the latter case, a failure of unknown origin was certified by the manufacturer and the device was rated against the CSR. Specific patterns of the V1 anomaly were first recognized in April 2019 and described in a case report.[3]

V1 screening started in May 2019 and so far more than 1100 EFI measurements have been conducted by the manufacturer and these were analyzed by him and our clinic staff. Up to the end of March 2022, 121 V1 devices, corresponding to 34.7%, were explanted at our clinic, mostly due to severe anomalies (118 devices of status S1b, 2 devices of status S1a, 1 device for medical reasons as described above). The explanted CIs were returned to the manufacturer for analysis unless the patient disagreed.

No V1 screening tests have yet been performed on 24 implants since these patients did not follow our repeated invitations for follow-up or already passed away.

Currently, DFA reports of explanted devices are completed by the manufacturer in 80 cases. In 76 cases, Advanced Bionics confirmed a device failure for the same reason: electrode short in the electrode pocket. In two cases, a failure of unknown origin was stated. In one case, broken electrode wires were found as the cause of failure. These 79 cases were rated against the CSR. One CI was explanted for medical reasons (see above). Up until now, our decision to re-implant was justified in all cases where DFA reports are available.

Table I shows the ratio of explanted versus implanted V1 devices accumulated over time for the two different V1 implant housings (HiRes Ultra and HiRes Ultra 3D).

Kaplan–Meier survival analysis was performed with the whole cohort of 349 V1 devices. The survival function is shown in Figure 2. The median survival time was 1062 days, 95% confidence interval ±90.5 days. In

TABLE I.
Cumulative Removal Percentage (CRP) Over Time.

| | | HiRes Ultra (V1) | | HiRes Ultra 3D (V1) | |
|---|---|---|---|---|---|
| | Year | x/i | CRP | x/i | CRP |
| Adults (≥10 years) | 1 | 0/82 | 0.0% | 0/64 | 0.0% |
| | 2 | 0/195 | 0.0% | 3/64 | 4.7% |
| | 3 | 11/211 | 5.2% | 10/64 | 15.6% |
| | 4 | 39/211 | 18.5% | (13/64) | (20.3%) |
| | 5 | 65/211 | 30.8% | | |
| | 6 | (69/211) | (32.7%) | | |
| Children (<10 years) | 1 | 1*/28 | 3.6% | 0/13 | 0.0% |
| | 2 | 2/57 | 3.6% | 0/13 | 0.0% |
| | 3 | 11/61 | 18.0% | 3/13 | 23.1% |
| | 4 | 24/61 | 39.3% | (3/13) | (23.1%) |
| | 5 | 34/61 | 55.7% | | |
| | 6 | (36/61) | (59.0%) | | |

*Note*: The table shows also the exact cumulative number of explanted (x) and implanted (i) devices up to the specified year since implantation started. The values in parentheses are corresponding to the years that have not yet been completed. All explantations were conducted due to V1 anomalies with one exception marked by an asterisk (*), which was explanted due to medical reasons. Patients are grouped regarding their age at implantation.




Fig. 2. Kaplan–Meier survival function for HiRes Ultra V1 and HiRes Ultra 3D V1 series devices. Implants, which did not show any anomalies so far (status S0), are right-censored (marked by a cross) at the time of the last investigation. When an anomaly was observed in an implant for the first time (status S1a or S1b), cumulative survival drops. [Color figure can be viewed in the online issue, which is available at www.laryngoscope.com.]

15314995, 2022, 0, Downloaded from https://onlinelibrary.wiley.com. By Readcube-Labtiva- on [23/05/2022]. Re-use and distribution is strictly not permitted, except for Open Access articles

TABLE II.
Statistical Data for All Subgroups.

| | I | | II | | III | |
|---|---|---|---|---|---|---|
| Subgroup | Ultra | Ultra 3D | Mid-Scala | SlimJ | Adults (≥10 years) | Children (<10 years) |
| Median survival time without anomaly (days) | 1093 | 1045 | 1015 | 1154 | 1130 | 980 |
| 95% confidence interval (days) | ±96.8 | ±261.1 | ±77.0 | ±209.9 | ±102.6 | ±97.4 |
| Number of devices | 272 | 77 | 209 | 140 | 275 | 74 |
| Number of devices with anomalies (status S1a or S1b) | 153 | 28 | 128 | 53 | 133 | 48 |
| Period of implantation | September 2016–November 2018 | November 2018–October 2019 | September 2016–April 2019 | September 2017–October 2019 | September 2016–October 2019 | September 2016–August 2019 |

*Note:* Median survival time for the appearance of an anomaly was estimated by Kaplan–Meier analysis.




Fig. 3. Examples of EFI measurement results. The decay of the electric field is shown for each of the 16 electrode contacts altogether. Eight different colors are used for this diagram. The blue shaded region just marks an impedance limit of 400 or 550 Ω, respectively. Diagrams are from the software EFI Analysis Tool, ver. 2.5. (A) Inconspicuous findings, status S0; (B) Severe anomalies on many electrode contacts, status S1b. Later, after re-implantation, a device failure was confirmed by the manufacturer. (C) Slight impedance sinks are visible on E11 (black arrow). Due to anomalies in ECAP responses (see Fig. 4), this implant was graded status S1a. (D) The same implant as shown in C, but 294 days later. A severe anomaly was found, status S1b. ECAP = evoked compound action potential; EFI = electrical field imaging. [Color figure can be viewed in the online issue, which is available at www.laryngoscope.com.]

15314995, 2022, 0, Downloaded from https://onlinelibrary.wiley.com. By Readcube-Labtiva- on [23/05/2022]. Re-use and distribution is strictly not permitted, except for Open Access articles




Fig. 4. ECAP Measurements of implant id 10162. Diagrams are from the software SoundWave, ver. 3.2.12. (A,B) ECAP responses on electrode channel E11 (recording electrode E9). Stimulus strength is given in clinical charge units (CU). ECAP amplitude (EP) is the difference in voltage between the negative and positive peaks, which are marked by dots. (C) The relative difference in ECAP amplitude between follow-up visits after 114 and 674 days for all electrode contacts of the whole array. On channel 11, ECAP amplitude is reduced the most. Data are shown for two different stimulus strengths, 200 and 250 CU, respectively. ECAP = evoked compound action potential. [Color figure can be viewed in the online issue, which is available at www.laryngoscope.com.]

addition, analysis was done likewise for different subgroups. Results are shown in Table II. A log-rank test was performed to assess whether significant differences exist between the two types of implant housings (subgroup I), the two types of electrode arrays (subgroup II), and between adults and children (subgroup III). Results show that survival distributions within the three subgroups do not differ significantly, subgroup I: $\chi^2 = 1.528$, $p = 0.216$; subgroup II: $\chi^2 = 0.893$, $p = 0.345$; subgroup III: $\chi^2 = 2.537$, $p = 0.111$.

Examples of EFI measurements in three different V1 series CIs are shown in Figure 3. Usually, the electric field is expected to decay with increasing distance to the stimulating electrode (Fig. 3A). Impedances below a certain limit are highlighted by a blue shaded region. Low impedance and impedance sinks may indicate short circuits.

15314995, 2022, 0, Downloaded from https://onlinelibrary.wiley.com. By Readcube-Labtiva- on [23/06/2022]. Re-use and distribution is strictly not permitted, except for Open Access articles

We observed that each EFI anomaly was also accompanied by a decrease in ECAP amplitude or a change in ECAP morphology. However, this was not always the case in reverse. In rare cases, broad artifacts covered the typical ECAP response, but the EFI pattern did not reveal any channel interactions.

Nevertheless, ECAP measurements seem to be a valuable tool to discover device failures. The EFI measurement in Figure 3C (674 days postoperatively) resembles the example shown in Figure 3A. However, there are slight impedance sinks visible on electrode E11, possibly indicating a short circuit. ECAP measurements show, that on E11 ECAP amplitude has decreased by about 50% in comparison to a former measurement (114 days postoperatively) when no impedance sink was visible on E11 (Fig. 4A,B). Nine months later (968 days postoperatively), severe EFI anomalies (status S1b) were found (Fig. 3D) and no ECAP response could be observed up to a stimulus strength of 236 CU (CU = manufacturer-specific clinical charge unit).

The relative difference in ECAP amplitude between two appointments (114 and 674 days postoperatively, respectively) is shown in Figure 4C for all electrode contacts. The biggest change was observable on E11. Further investigations are necessary to confirm if consecutive ECAP measurements can really predict the observed device failure. At least, decreasing ECAP amplitudes and decreasing loudness perception can be expected when the intended electrical stimulus strength is compromised by short circuits.

## DISCUSSION

In this retrospective study, we investigated the time course of anomalies for the initial version (V1) of HiRes Ultra and HiRes Ultra 3D CIs. The associated failure is caused by fluid ingress nearby the ring electrode. Fluid migrates into the electrode pocket of the implant, causing conductive connections between some electrode leads. As a result, the impedance on affected electrodes drops. Patients may experience decreased loudness and the stimulation current (M-Level) required for a pleasantly loud auditory perception must then be increased. ECAP responses may decrease in amplitude and be masked by artifacts. The fluid does not reach the core of the implant, so intermittencies or a complete shut-off do not occur. However, some patients experience distorted sound, and speech comprehension may be impaired, especially in noise.

Habituation is a crucial factor. If an anomaly occurred very early, perhaps even immediately after implantation, the patient will not perceive any impairment in speech recognition or sound quality because he or she has never gotten the opportunity to experience the full performance of the implant. Therefore, an assessment of the status of the implant based on speech understanding alone is insufficient. It would be interesting to analyze if speech comprehension scores correlate to the number and location of affected electrode channels and corresponding parameters like impedance and ECAP amplitude. This will be the subject of a subsequent study.

Since Advanced Bionics is on site at our clinic, V1 screening using EFI measurements could be performed at each follow-up, regardless of whether the patient complained any deteriorations or not. Our additional monitoring of impedances and ECAP responses would be a measure that any clinician or audiologist can perform themselves on a regular basis to detect a potential anomaly. However, low impedances alone are not usually regarded as an anomaly. Impedance values can be affected by several mechanisms. After implantation, fibrous tissue growth around the electrode array will lead to an increase in impedance. On deactivated channels, impedance generally increases as cells like macrophages and fibroblasts deposit on the corresponding electrode contact as a result of natural endogenous defense response. When the channel is reactivated, the impedance decreases again due to the electrical stimulation.[12,13] On the other hand, electrical stimulation outside the compliance limit may also lead to an increase in impedance.[14]

The assessment of the status of the implant was essentially based on the EFI measurements performed by the manufacturer. This may induce some bias. However, the measurement results were also reviewed by clinical specialists at our institution, and their classification did not always agree with that of the manufacturer. Most CIs were explanted only if, in addition to an EFI anomaly, one or more other reasons were given as follows: a significant decrease in speech comprehension; distorted sound perception; absence of ECAP responses when the fitting was already based on ECAP thresholds, as is often the case in little children.

So far, each device with status S1 that was explanted, was rated against CSR by the manufacturer after analysis. This confirms our approach to deciding whether reimplantation was necessary.

Kaplan–Meier survival analysis revealed no statistically significant difference in the median survival time between the two types of electrode arrays. However, as of the end of March 2022, anomalies (status S1a and/or S1b) were found in 128 (61.2%) implants with Mid-Scala electrode and in 53 (37.9%) implants with SlimJ electrode, which suggests that Mid-Scala would be more susceptible to anomalies. The apparent difference can be attributed to the time difference from when implantation started. We began with the HiRes Ultra Mid-Scala device in September 2016 and 1 year later, implantations of HiRes Ultra SlimJ started. Anomalies were initially noticed only in Ultra Mid-Scala devices, and we considered possible influences of surgical technique and/or electrode design. Apparently, no other clinic had comparable issues at that time, or regulatory authorities had not been notified by other institutions. Later, also devices with SlimJ electrode arrays showed anomalies.

Since the housing of Ultra and Ultra 3D only differs in the design of the magnet, we would not expect any impact on survival time. Indeed, no statistically significant difference was found.

When we first recognized an uncommon course of CI parameters (M-level, impedances, ECAP response) in April 2019,[3] the manufacturer could not find any anomaly by using EFI because some of the applied measurements had no established test limits at that time. Meanwhile, the EFI Analysis Tool will help to detect anomalies. However, at least 2–3 electrodes must be affected to classify a possible device failure, depending on the specific measurement.

In their last global reliability report,[15] Advanced Bionics refers to more than 12,100 HiRes Ultra V1 and more than 6300 HiRes Ultra 3D V1 implants. Both implant types have been removed from children about twice as often as from adults due to device failures. As shown in Table I, we also noticed this ratio. In contrast, Kaplan–Meier analysis showed no significant difference in the occurrence of anomalies between adults and children. According to our experience, adults hesitate to get re-implanted when the device is still working, even though speech comprehension has deteriorated. Small children will be re-implanted within a shorter period of time after the appearance of severe anomalies to ensure the best possible speech development.

Compared to Advanced Bionics' global reliability report,[15] we see twice the CRP (Table I) after 4 years. Therefore, one could speculate that the new implant failure mode has not yet been detected in many institutions.

## CONCLUSION

Continuous testing at follow-up visits is needed for patients with CIs to monitor the full functionality of their devices. Clinicians and audiologists should be alert for new and unexpected failure patterns. In cases where language development is not yet complete, re-implantation must be considered early enough.

## BIBLIOGRAPHY


1. Sonova. AB Initiates Voluntary Field Corrective Action—Strong Performance of the Hearing Instruments business. Accessed April 06, 2022. https://www.sonova.com/en/ab-initiates-voluntary-field-corrective-action-strong-performance-hearing-instruments-business.
2. Advanced Bionics. Voluntary Field Corrective Action of HiRes Ultra and Ultra 3D. Accessed April 06, 2022. https://www.advancedbionics.com/com/en/home/about-us/news/press-releases/2020/voluntary-field-corrective-action-hires-ultra-and-ultra-3d.html.
3. Gärtner L, Büchner A, Illg A, Lenarz T. Hidden electrode failure in a Cochlear implant user. *Laryngoscope*. 2021;131(4):E1276-E1278. https://doi.org/10.1002/lary.29023.
4. Lenarz T. Cochlear implant—state of the art. *Curr top Otorhinolaryngol Head Neck Surg*. 2017;16:Doc04.
5. He S, Teagle HFB, Buchman CA. The electrically evoked compound action potential: from laboratory to clinic. *Front Neurosci*. 2017;11:1-20. https://doi.org/10.3389/fnins.2017.00339.
6. Vanpoucke FJ, Zarowski AJ, Peeters SA. Identification of the impedance model of an implanted cochlear prosthesis from intracochlear potential measurements. *IEEE Trans Biomed Eng*. 2004;51(12):2174-2183. https://doi.org/10.1109/TBME.2004.836518.
7. International standard ISO 5841-2:2014. *Implants for surgery—Cardiac pacemakers—Part 2: Reporting of clinical performance of populations of pulse generators or leads*. Geneva, Switzerland: International Organization for Standardization; 2014. second edition 2000, third edition 2014.
8. O'Donoghue G. European consensus statement on cochlear implant failures and explantations. *Otol Neurotol*. 2005;26(6):1097-1099. https://doi.org/10.1097/01.mao.0000194885.51647.bb.
9. Battmer RD, Backous DD, Balkany TJ, et al. International classification of reliability for implanted cochlear implant receiver stimulators. *Otol Neurotol*. 2010;31(8):1190-1193. https://doi.org/10.1097/MAO.0b013e3181d2798e.
10. ANSI/AAMI CI86. *Cochlear Implant Systems: Requirements for Safety, Functional Verification, Labeling and Reliability Reporting*. Arlington, VA: American National Standards Institute; 2017 ISBN: 978-1-57020-662-7.
11. Kaplan EL, Meier P. Nonparametric estimation from incomplete observations. *J Am Stat Assoc*. 1958;53(282):457-481. https://doi.org/10.2307/2281868.
12. Newbold C, Mergen S, Richardson R, et al. Impedance changes in chronically implanted and stimulated cochlear implant electrodes. *Cochlear Implants Int*. 2014;15(4):191-199. https://doi.org/10.1179/1754762813Y.0000000050.
13. Newbold C, Richardson R, Huang CQ, Milojevic D, Cowan R, Shepherd R. An in vitro model for investigating impedance changes with cell growth and electrical stimulation: implications for cochlear implants. *J Neural Eng*. 2004;1(4):218-227. https://doi.org/10.1088/1741-2560/1/4/005.
14. Neuburger J, Lenarz T, Lesinski-Schiedat A, Büchner A. Spontaneous increases in impedance following cochlear implantation: suspected causes and management. *Int J Audiol*. 2009;48(5):233-239. https://doi.org/10.1080/14992020802600808.
15. Advanced Bionics. Reliability Report Autumn 2021. Accessed April 06, 2022. https://www.advancedbionics.com/content/dam/advancedbionics/Documents/Global/en_ce/Professional/Technical-Reports/Reliability/Global-AB-Reliability-Report-Autumn-2021.pdf.


15314995, 2022, 0, Downloaded from https://onlinelibrary.wiley.com. By Readcube-Labtiva- on [23/05/2022]. Re-use and distribution is strictly not permitted, except for Open Access articles

# Exhibit 3

sonova
HEAR THE WORLD

# Media Release

## AB initiates voluntary field corrective action – Strong performance of the Hearing Instruments business

***Stäfa (Switzerland), February 18, 2020*** **– Sonova Holding AG, a leading provider of hearing solutions, informs of a voluntary field corrective action by its US subsidiary Advanced Bionics LLC (AB). AB has notified relevant regulatory bodies that it will retrieve un-implanted devices of the initial version of HiRes Ultra and Ultra 3D cochlear implant devices, which are currently superseded by a recently approved new version of the devices. The voluntary field corrective action is expected to temporarily affect the sales and earnings development of AB during the deployment of the new version of the product.**

**Further, Sonova is pleased to announce that the Hearing Instruments business has developed stronger than expected following the publication of the half-year report. Reflecting the strong performance of the Hearing Instruments business and despite the temporary negative effects of the voluntary field corrective action of AB, Sonova raises its outlook for FY 2019/20. The Group now expects sales to grow by 9-11% (from 8%-10%) and the adjusted EBITA to rise between 14%-17% (from 12%-15%), both measured in local currencies. This excludes one-time costs that are currently estimated in the range of CHF 40-50 million, related to the voluntary field corrective action of AB.**

**AB initiates voluntary field corrective action – New implant version currently rolled out**
Upon observing reports of decreased hearing performance of a limited number of HiRes Ultra and Ultra 3D cochlear implant devices and reflecting AB's efforts to continually enhance its products, improvements were developed with the help of independent health care practitioners. The new version of the device recently received regulatory approvals in major markets and is currently rolled out based on availability.

However, in an abundance of caution, AB will initiate a voluntary field corrective action relating to the HiRes Ultra and Ultra 3D cochlear implant devices, which includes the retrieval of un-implanted devices without those improvements as well as further appropriate steps. This is in response to AB's quality system which recorded recent increases in the number of explants of devices, related to lower impedances and reports of decreased hearing performance. To date, less than 0.5% of recipients have been explanted and, based on AB's quality system monitoring, the vast majority of HiRes Ultra and Ultra 3D implants continue to function properly. This situation does not present a device related safety issue to the recipients.

Sonova Holding AG
Laubisrütistrasse 28

Phone +41 58 928 33 33
Fax +41 58 928 33 45

**Strong development of the Hearing Instruments business**

Since the publication of the results for the first half of FY 2019/20, Sonova's Hearing Instruments business has developed stronger than expected. The business achieved continued strong growth across key markets despite a more challenging comparison base after the anniversary of the Phonak Marvel launch at the end of November. This was driven by the success of new solutions and features introduced with Marvel 2.0 in August 2019. In addition, the increased investments into the sales coverage and marketing capabilities initiated during the first half of FY 2019/20 supported growth in the second half. A key highlight was the US, where Sonova expanded its market share across channels, driven by a further expansion of its leading position with the US Department of Veterans Affairs (VA), a new private label contract with a large US retailer and strong growth in the independent channel. Sonova thus expects the result of the Hearing Instruments business to exceed previous expectations.

**Updated outlook 2019/20**

In light of the strong development of the Hearing Instruments business and despite the temporary negative effects of the voluntary field corrective action of AB, Sonova raises the outlook for FY 2019/20. The Group now expects sales to grow by 9%-11% (from 8%-10%) and the adjusted EBITA to rise between 14%-17% (from 12%-15%), both measured in local currencies. The outlook for adjusted EBITA growth excludes one-time costs that are currently estimated in the range of CHF 40-50 million, related to the voluntary field corrective action of AB. As a consequence of the strengthening of the Swiss franc and based on current exchange rates, Sonova anticipates reported sales growth to be reduced by around 3 percentage points and the adjusted EBITA growth in Swiss francs to be negatively affected by around 6 percentage points in FY 2019/20. In reported Swiss francs, this implies an increase in sales between 6%-8% and a rise in the adjusted EBITA between 8%-11%.

Due to the outbreak of the novel coronavirus (COVID-19), Sonova's operations in China resumed their activities after the Chinese New Year one week later than previously planned. At this time, this is not expected to materially impact Sonova's results.

Arnd Kaldowski, CEO of Sonova, says: "While the voluntary field corrective action announced today is disappointing, it demonstrates our continued commitment to put patients first. Our Cochlear Implants business is an important element of our ambition to provide a solution for every type of hearing loss and we are confident about the potential for the business going forward. I am very happy about the continued strong development of our Hearing Instruments business and the overall sales and profitability development of the Group, clearly demonstrating the success of our strategy."

**Conference call**

Sonova will host a conference call for members of the media, today, February 18, 2020, at 09.30 AM CET to discuss today's announcement.

**The conference call can be accessed at:**

+41 (0) 58 310 50 00 (Europa)
+44 (0) 207 107 06 13 (UK)
+1 (1) 631 570 56 13 (USA)

– End –

**Contacts:**

**Investor Relations**

Thomas Bernhardsgrütter
Phone +41 58 928 33 44
Mobile +41 79 618 28 07
Email thomas.bernhardsgruetter@sonova.com

**Media Relations**

Patrick Lehn
Telefon +41 58 928 33 23
Mobil +41 79 410 82 84
E-Mail patrick.lehn@sonova.com

**Disclaimer**
This Media Release contains forward-looking statements, which offer no guarantee with regard to future performance. These statements are made on the basis of management's views and assumptions regarding future events and business performance at the time the statements are made. They are subject to risks and uncertainties including, but not confined to, future global economic conditions, exchange rates, legal provisions, market conditions, activities by competitors and other factors outside Sonova's control. Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, actual outcomes may vary materially from those forecasted or expected. Each forward-looking statement speaks only as of the date of the particular statement, and Sonova undertakes no obligation to publicly update or revise any forward-looking statements, except as required by law.

**About Sonova**
Sonova, headquartered in Stäfa, Switzerland, is a leading provider of innovative hearing care solutions. The Group operates through its core business brands Phonak, Unitron, Hansaton, Advanced Bionics and AudioNova. Sonova offers its customers one of the most comprehensive product portfolios in the industry – from hearing instruments to cochlear implants to wireless communication solutions.

Pursuing a unique vertically integrated business strategy, the Group operates through three core businesses – hearing instruments, audiological care and cochlear implants – along the entire value chain of the hearing care market. The Group's sales and distribution network, the widest in the industry, comprises over 50 own wholesale companies and more than 100 independent distributors. This is complemented by Sonova's audiological care business, which offers professional audiological services through a network of around 3,500 locations in 19 key markets.

Founded in 1947, the Group has a workforce of over 14,000 dedicated employees and generated sales of CHF 2.76 billion in the financial year 2018/19 as well as a net profit of CHF 460 million. Across all businesses, and by supporting the Hear the World Foundation, Sonova pursues its vision of a world where everyone enjoys the delight of hearing and therefore lives a life without limitations.

For more information please visit www.sonova.com and www.hear-the-world.com.

Sonova shares (ticker symbol: SOON, Security no: 1254978, ISIN: CH0012549785) have been listed on the SIX Swiss Exchange since 1994. **The securities of Sonova have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "U.S. Securities Act"), or under the applicable securities laws of any state of the United States of America, and may not be offered or sold in the United States of America except pursuant to an exemption from the registration requirements under the U.S. Securities Act and in compliance with applicable state securities laws, or outside the United States of America to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.**

# Exhibit 4

**CORPORATE INTEGRITY AGREEMENT**
**BETWEEN THE**
**OFFICE OF INSPECTOR GENERAL**
**OF THE**
**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**AND**
**ADVANCED BIONICS LLC**

## I. PREAMBLE

Advanced Bionics LLC (Manufacturer or "Advanced Bionics") hereby enters into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements) and with the statutes, regulations, and written directives of the Food and Drug Administration (FDA requirements). Contemporaneously with this CIA, Advanced Bionics is entering into a Settlement Agreement with the United States.

## II. EFFECTIVE DATE, TERM, AND DEFINITIONS

A. Effective Date. The "Effective Date" of this CIA shall be the signature date of the final signatory of this CIA.

B. Term. The term of this CIA shall be five years from the Effective Date, except that Sections VII and X shall continue for 120 days after OIG's receipt of: (1) Advanced Bionics's final Annual Report or (2) any additional documentation relating to the final Annual Report requested by OIG, whichever is later. In addition, if OIG issues a Stipulated Penalties Demand Letter pursuant to Section X.C.1 or a Notice of Material Breach and Intent to Exclude pursuant to Section X.E.2 prior to the expiration of the 120 day period, then Section X shall remain in effect until the Stipulated Penalties Review described in Section X.E.2 or the Exclusion Review described in Section X.E.3 has been completed, and Advanced Bionics complies with the decision.

C. Definitions.

1. "Certifying Covered Persons" means the following: Senior Vice President, Global R&D; Vice President, Global Regulatory Affairs; and Vice President, Global Quality Assurance.

2. "Covered Functions" means all activities that involve the preparation or submission of Premarket Approval Applications (PMAs) to the FDA and all communications (initial and supplemental) with the FDA about PMAs and the component elements of PMAs, including but not limited to any performance standards applicable to Government Reimbursed Products Advanced Bionics relied upon in those submissions.

3. "Covered Persons" means: (a) all owners of Advanced Bionics who are

natural persons (other than shareholders who: (i) have an ownership interest of less than 5% and (ii) acquired the ownership interest through public trading); (b) all officers, board members, and employees of Advanced Bionics; and (c) all contractors who perform any of the Covered Functions on behalf of Advanced Bionics.

Notwithstanding the above, the term "Covered Persons" does not include part-time or per diem employees, contractors, subcontractors, agents, and other persons who are not reasonably expected to perform a Covered Function for Advanced Bionics for more than 160 hours a year, except that such individual shall become a "Covered Person" at the point when they work more than 160 hours on a Covered Function for Advanced Bionics during the calendar year.

4. "Disclosure Program" means a program that enables individuals to disclose to the Compliance Officer or some other person who is not in the disclosing individual's chain of command any potential violations of criminal, civil or administrative law related to the Federal health care programs or any issues or questions associated with Advanced Bionics's policies, conduct, practices, or procedures.

5. "Exclusion Lists" means the HHS/OIG List of Excluded Individuals/Entities (LEIE) (available at http://www.oig.hhs.gov) and State Medicaid program exclusion lists that are publicly available.

6. "Government Reimbursed Products" means all Advanced Bionics products that are: (a) marketed or sold by Advanced Bionics in the United States (or pursuant to contracts with the United States) and (b) reimbursed by Federal health care programs.

7. "Ineligible Person" means an individual or entity who: (a) is currently excluded from participation in any Federal health care program or (b) has been convicted of a criminal offense that falls within the scope of 42 U.S.C. § 1320a-7(a) (mandatory exclusion) but has not yet been excluded from participation in any Federal health care program.

8. "Reportable Event" means: (a) a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which criminal or civil monetary penalties under Section 1128A or 1128B of the Social Security Act (the "Act") or exclusion under Section 1128 of the Act may be authorized; (b) a matter that a reasonable person would consider a probable violation of FDA requirements relating to any published PMA-related performance standard as referenced in 21 C.F.R. § 814.20(b)(5), including compliance with or deviation from such performance standards; (c) the employment of or contracting with a Covered Person who is an Ineligible Person; or (d) the filing of a bankruptcy petition by Advanced Bionics.

9. "Reporting Period" means each one-year period during the term of this CIA, beginning with the one-year period following the Effective Date.

10. "Training Plan" means a written plan that outlines the steps Advanced Bionics will take to ensure that Covered Persons receive training on a periodic basis during the term of the CIA regarding Advanced Bionics's CIA requirements and compliance program, and that all Covered Persons who engage in Covered Functions receive training on a periodic basis

during the term of the CIA regarding: (a) all applicable Federal health care program and FDA requirements relating to Covered Functions and (b) all Advanced Bionics Policies and Procedures and other requirements applicable to Covered Functions.

11. "Transition Plan" means a plan to address whether and how Advanced Bionics's compliance program will continue to include the compliance program requirements set forth in Section III of the CIA, following the end of the CIA's term.

## III. COMPLIANCE PROGRAM REQUIREMENTS

Advanced Bionics shall establish and maintain a compliance program that includes the following elements:

A. Compliance Officer, Compliance Committee, Board Oversight, and Management Certifications.

1. *Compliance Officer*. Within 90 days after the Effective Date, Advanced Bionics shall appoint a Compliance Officer who is an employee and a member of senior management of Advanced Bionics. The Compliance Officer shall report directly to the President of Advanced Bionics and shall not be or be subordinate to the General Counsel or Chief Financial Officer or have any responsibilities that involve acting in any capacity as legal counsel or supervising legal counsel functions for Advanced Bionics. The Compliance Officer shall be authorized to report to the Board of Managers of Advanced Bionics (Board) regarding compliance matters at any time. The Compliance Officer shall be responsible for, without limitation:

a. developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with Federal health care program and FDA requirements;

b. making at least quarterly reports regarding compliance matters to the Board;

c. monitoring the day-to-day compliance activities engaged in by Advanced Bionics; and

d. all reporting requirements of this CIA.

The Compliance Officer shall not have any noncompliance job responsibilities that, in OIG's discretion, may interfere or conflict with the Compliance Officer's ability to perform the duties outlined in this CIA.

Advanced Bionics shall report to OIG, in writing, any changes in the identity, duties, or job responsibilities of the Compliance Officer within five business days after such a change.

2. *Compliance Committee*. Within 90 days after the Effective Date, Advanced Bionics shall appoint a Compliance Committee that is chaired by the Compliance

Officer. The Compliance Committee shall include, at a minimum, the members of senior management necessary to meet the requirements of this CIA. The Compliance Committee shall be responsible for, among other things, reviewing the policies and procedures required by Section III.B below at least annually, reviewing the training required by Section III.C below at least annually, implementation and oversight of the risk assessment and internal review process required by Section III.E below, and the development and implementation of the Transition Plan required by Section III.K below. The Compliance Committee shall meet at least quarterly.

Advanced Bionics shall report to OIG, in writing, any changes to the membership of the Compliance Committee within 15 business days after such a change.

3. *Board Oversight*. The Board shall be responsible for the review and oversight of Advanced Bionics's compliance with Federal health care program requirements, FDA requirements, and the requirements of this CIA. The Board must include at least one independent (i.e., non-employee and non-executive) member.

The Board shall, at a minimum, be responsible for the following:

a. meeting at least quarterly to review and oversee Advanced Bionics's compliance program, including but not limited to the performance of the Compliance Officer and Compliance Committee;

b. submitting to OIG a description of the materials it reviewed and any additional steps taken, such as the engagement of an independent advisor or other third party resources, in its oversight of the compliance program and in support of making the resolution below during each Reporting Period; and

c. for each Reporting Period of the CIA, adopting a resolution, approved by each member of the Board regarding its review and oversight of Advanced Bionics's compliance with Federal health care program requirements, FDA requirements, and the requirements of this CIA.

At minimum, the resolution shall include the following language:

> "The Board has made a reasonable inquiry into the operations of Advanced Bionics's compliance program including the performance of the Compliance Officer and the Compliance Committee. Based on its inquiry and review, the Board has concluded that, to the best of its knowledge, Advanced Bionics has implemented an effective compliance program to meet Federal health care program requirements, FDA requirements, and the requirements of Advanced Bionics's Corporate Integrity Agreement with the Office of Counsel to the Inspector General for the Department of Health and Human Services."

If the Board is unable to adopt such a resolution, the Board shall provide a written explanation of the reasons why it is unable to adopt the resolution and the steps it is taking to implement an effective compliance program at Advanced Bionics.

Advanced Bionics shall report to OIG, in writing, any changes to the membership of the Board, within 15 business days after such a change.

4. *Management Certifications*. The Certifying Covered Persons shall monitor compliance within the business unit for which they are responsible and annually certify that the applicable Advanced Bionics business unit is in compliance with applicable Federal health care program and FDA requirements and with the requirements of this CIA. For each Reporting Period, each Certifying Covered Person shall certify as follows:

> "I have been trained on and understand the compliance requirements and responsibilities as they relate to [insert name of business unit ], an area under my supervision. My job responsibilities include ensuring [business unit]'s compliance with all applicable Federal health care program requirements, FDA requirements, requirements of the Corporate Integrity Agreement, and Advanced Bionics's policies and procedures. To the best of my knowledge, the [insert name of business unit] of Advanced Bionics is in compliance with all applicable Federal health care program requirements, FDA requirements, and the requirements of the Corporate Integrity Agreement. I understand that this certification is being provided to and relied upon by the United States."

If any Certifying Covered Person is unable to provide such a certification, the Certifying Covered Person shall provide a written explanation of the reasons why he or she is unable to provide the certification.

Within 90 days after the Effective Date, Advanced Bionics shall develop and implement a written process for Certifying Covered Persons to follow for the purpose of completing the certification required by this section (e.g., reports that must be reviewed, assessments that must be completed, sub-certifications that must be obtained, etc. prior to the Certifying Covered Person making the required certification).

B. Written Standards. Within 90 days after the Effective Date, Advanced Bionics shall develop and implement written policies and procedures (Policies and Procedures) that address the following: (1) the operation of its compliance program, including the compliance program requirements outlined in this CIA and (2) Advanced Bionics's compliance with Federal health care program and FDA requirements. Advanced Bionics shall enforce its Policies and Procedures and shall make compliance with its Policies and Procedures an element of evaluating the performance of all Covered Persons. The Policies and Procedures shall be made available to all Covered Persons. At a minimum, the Policies and Procedures shall address the following:

1. appropriate ways to conduct Covered Functions in compliance with all: (a) applicable Federal health care program requirements, including, but not limited to the Federal

Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and the False Claims Act, 31 U.S.C. §§ 3729-3733, and (b) all applicable FDA requirements;

2. the materials and information that may be distributed by Advanced Bionics (including any contract sales force) about Government Reimbursed Products and the manner in which Advanced Bionics responds to requests for information about uses of Government Reimbursed Products that are not FDA approved, cleared or exempt ("non-FDA approved uses"), and the internal review process for the information disseminated;

3. financial arrangements entered into with health care professionals (HCPs) or health care institutions (HCIs) (including but not limited to speaker programs, speaker training programs, training and education services, product development activities, presentations, consultant task force meetings, advisory boards, ad hoc advisory activities, research and research-related activities, grant-related activities, authorship activities, and any other financial engagement or arrangement with an HCP or HCI) and all events and expenses relating to such engagements or arrangements;

4. review of promotional, reimbursement-related, and disease state materials and information intended to be disseminated outside Advanced Bionics by appropriate qualified personnel (such as regulatory, medical, and/or legal personnel) in a manner designed to ensure that legal, regulatory, and medical concerns are properly addressed during Advanced Bionics's review and approval process and are elevated when appropriate; and

5. disciplinary policies and procedures for violations of Advanced Bionics's Policies and Procedures, including policies relating to Federal health care program and FDA requirements.

The Compliance Committee shall review the Policies and Procedures at least annually and update the Policies and Procedures, as necessary. Any new or revised Policies and Procedures shall be made available to all Covered Persons. All Policies and Procedures shall be made available to OIG upon request.

C. <u>Training and Education</u>

1. *Covered Persons Training*. Within 90 days after the Effective Date, Advanced Bionics shall develop a Training Plan that includes the following information: (a) training topics; (b) categories of Covered Persons required to attend each training session; (c) length of the training session(s); (d) schedule for training; and (e) format of the training. The Compliance Committee shall review the Training Plan at least annually and update the Training Plan as necessary.

2. *Board Training*. Within 90 days after the Effective Date, members of the Board shall receive training regarding their responsibilities for corporate governance and review and oversight of the compliance program. The training shall address the specific responsibilities of health care board members, including the risks, oversight areas, and approaches to conducting effective oversight of a health care entity and shall include a discussion of OIG's guidance on

board member responsibilities. Each member of the Board also shall receive the training described in Section III.C.1.

New members of the Board shall receive the training described in this Section III.C. 2 above within 30 days after becoming a member or within 90 days after the Effective Date, whichever is later. The Compliance Committee shall review the Board training at least annually and update the Board training as necessary.

3. *Training Records*. Advanced Bionics shall make available to OIG, upon request, training materials and records verifying that the training described in Sections III.C.1 and III.C.2 has been provided.

D. Review Procedures.

1. *General Description.*

a. *Engagement of Independent Review Organization*. Within 90 days after the Effective Date, Advanced Bionics shall engage an entity ("Independent Review Organization" or "IRO") that meets the qualifications outlined in Appendix A to this CIA, which is incorporated by reference, to perform the reviews described in this Section III.D.

b. *Retention of Records*. The IRO and Advanced Bionics shall retain and make available to OIG, upon request, all work papers, supporting documentation, correspondence, and draft reports exchanged between the IRO and Advanced Bionics related to the reviews described in this Section III.D.

c. *Access to Records and Personnel*. Advanced Bionics shall ensure the IRO has access to all records and personnel necessary to complete the reviews listed in this Section III.D, and that all records furnished to the IRO are accurate and complete.

2. *Systems Review and Transactions Review, and Additional Item Review.* The IRO shall perform a Systems Review and a Transactions Review relating to the Covered Functions, and (if required) an Additional Item Review, and shall prepare a Systems Review Report and a Transactions Review Report, as outlined in Appendix B to this CIA, which is incorporated by reference.

3. *Independence and Objectivity Certification*. The IRO shall include in its report(s) to Advanced Bionics a certification that the IRO has: (a) evaluated its professional independence and objectivity with respect to the reviews required under this Section III.D; and (b) concluded that it is, in fact, independent and objective in accordance with the requirements specified in Appendix A to this CIA. The IRO's certification shall include a summary of current and prior engagements between Advanced Bionics and the IRO.

E. Risk Assessment and Internal Review Process. Within 90 days after the Effective Date, Advanced Bionics shall develop and implement a centralized annual risk assessment and internal review process to identify and address risks associated with each Government Reimbursed Product, including risks associated with the Covered Functions. The risk assessment and internal review process shall include pre-submission reviews for all PMA-related submissions to the FDA. The Compliance Committee shall be responsible for implementation and oversight of the risk assessment and internal review process. The risk assessment and internal review process shall be conducted annually and shall require Advanced Bionics to: (1) identify and prioritize risks, (2) develop work plans or internal audit plans (as appropriate) related to the identified risk areas, (3) implement the work plans and internal audit plans, (4) develop corrective action plans in response to the results of any internal audits performed, and (5) track the implementation of the work plans and any corrective action plans and assess the effectiveness of such plans.

F. Disclosure Program. Within 90 days after the Effective Date, Advanced Bionics shall establish a Disclosure Program. Advanced Bionics shall appropriately publicize the existence of the Disclosure Program and the disclosure mechanism (e.g., via periodic e-mails to employees, or by posting the information in prominent common areas). The Disclosure Program shall include a reporting mechanism for anonymous communications for which appropriate confidentiality shall be maintained. The Disclosure Program shall prohibit retaliation against Covered Persons relating to the use of the Disclosure Program and Advanced Bionics shall not retaliate against Covered Persons for use of the Disclosure Program. The Compliance Officer (or designee) shall conduct a review of each disclosure received through the Disclosure Program, including gathering all relevant information from the disclosing individual, and ensure that appropriate follow-up is conducted.

The Compliance Officer (or designee) shall record all disclosures (whether or not related to a potential violation of criminal, civil or administrative law related to Federal health care programs or FDA requirements) in a written disclosure log within two business days of receipt of the disclosure. The disclosure log shall include the following information: (1) a summary of each disclosure received (whether anonymous or not), (2) the date the disclosure was received, (3) the individual or department responsible for reviewing the disclosure, (4) the status of the review, (5) any corrective action taken in response to the review, and (6) the date the disclosure was resolved.

G. Ineligible Persons.

1. *Screening Requirements.* Advanced Bionics shall:

a. screen all prospective Covered Persons against the Exclusion Lists prior to engaging their services and, as part of the hiring or contracting process, shall require such Covered Persons to disclose whether they are Ineligible Persons;

b. screen all current Covered Persons against the Exclusion Lists within 90 days after the Effective Date and on a monthly basis thereafter; and

c. require all Covered Persons to disclose immediately to the Compliance Officer (or designee) if they become an Ineligible Person.

2. *Removal Requirement*. If Advanced Bionics has actual notice that a Covered Person has become an Ineligible Person, Advanced Bionics shall remove such Covered Person from any position for which the Covered Person's compensation or the items or services furnished, ordered, or prescribed by the Covered Person are paid in whole or part, directly or indirectly, by any Federal health care program(s) from which the Covered Person has been excluded, at least until such time as the Covered Person is reinstated into participation in such Federal health care program(s). Items or services furnished, ordered, or prescribed by excluded persons are not payable by Federal health care programs and Advanced Bionics may be liable for overpayments and/or criminal, civil, and administrative sanctions for employing or contracting with an excluded person regardless of whether Advanced Bionics meets the requirements of Section III.G.

H. Notification of Government Investigation or Legal Proceeding. Advanced Bionics shall notify OIG, in writing, of any ongoing investigation or legal proceeding by a governmental entity or its agents involving an allegation that Advanced Bionics has committed a crime or has engaged in fraudulent activities, within 30 days of Advanced Bionics receiving notice of such investigation or legal proceeding. This notification shall include a description of the allegation(s), the identity of the investigating or prosecuting agency, and the status of the investigation or legal proceeding. Within 30 days after resolution of the matter, Advanced Bionics shall notify OIG, in writing, of the resolution of the investigation or legal proceeding.

I. Reportable Events. Advanced Bionics shall notify OIG, in writing, within 30 days after determining that a Reportable Event exists, as follows:

1. *Probable Violation of Law*. The report to OIG shall include:

a. a complete description of all details relevant to the Reportable Event, including, at a minimum, the types of claims, transactions or other conduct giving rise to the Reportable Event, the period during which the conduct occurred, and the names of individuals and entities believed to be implicated, including an explanation of their roles in the Reportable Event;

b. a statement of the Federal criminal, civil or administrative laws that are probably violated by the Reportable Event, if any;

c. the Federal health care programs affected by the Reportable Event, if any; and

d. a description of Advanced Bionics's actions taken to correct the Reportable Event and prevent it from recurring.

2. *Probable Violation of FDA Requirements.* The report to OIG shall include:

a. a complete description of all details relevant to the Reportable Event, including, at a minimum, the types of claims, transactions or other conduct giving rise to the Reportable Event, the period during which the conduct occurred, and the names of individuals and entities believed to be implicated, including an explanation of their roles in the Reportable Event;

b. a statement of the FDA requirements probably violated by the Reportable Event, if any; and

c. a description of Advanced Bionics's actions taken to correct the Reportable Event and prevent it from recurring.

3. *Ineligible Person.* The report to OIG shall include:

a. the identity of the Ineligible Person and the job duties performed by that individual;

b. the dates of the Ineligible Person's employment or contractual relationship;

c. a description of the Exclusion Lists screening that Advanced Bionics completed before and/or during the Ineligible Person's employment or contract and any flaw or breakdown in the screening process that led to the hiring or contracting with the Ineligible Person;

d. a description of how the Ineligible Person was identified; and

e. a description of any corrective action implemented to prevent future employment or contracting with an Ineligible Person.

4. *Bankruptcy.* The report to OIG shall include documentation of the bankruptcy filing and a description of any Federal health care program or FDA requirements implicated.

J. Notification of Communications with FDA. Within 30 days after the date of any written report, correspondence, or communication between Advanced Bionics and the FDA that materially discusses Advanced Bionics's or a Covered Person's actual or potential unlawful or improper PMA-related activities involving performance standards (including without limitation any false, misleading, or materially incomplete statements), Advanced Bionics shall provide a

copy of the report, correspondence, or communication to OIG. Within 30 days after resolution of the matter, Advanced Bionics shall notify OIG, in writing, of the resolution.

K. Transition Plan. Prior to the end of the fourth Reporting Period, Advanced Bionics shall develop a Transition Plan that is reviewed and approved by the Board. The Transition Plan shall be implemented following the end of the CIA's term. A copy of Advanced Bionics's approved Transition Plan shall be included in Advanced Bionics's fourth Annual Report.

## IV. SUCCESSOR LIABILITY

If, after the Effective Date, Advanced Bionics proposes to (a) sell any or all of its business, business units or locations (whether through a sale of assets, sale of stock or other type of transaction) that engage in any of the Covered Functions; or (b) purchases or establishes a new business, business unit or location relating to or that will engage in any of the Covered Functions, the CIA shall be binding on the purchaser of any business, business unit or location and any new business, business unit or location (and all Covered Persons at each new business, business unit or location) shall be subject to the requirements of this CIA, unless otherwise determined and agreed to in writing by OIG. Advanced Bionics shall notify OIG, in writing, of such sale or purchase within 30 days following the closing of the transaction and shall notify OIG, in writing, within 30 days of establishing such new business, business unit or location.

If Advanced Bionics wishes to obtain a determination by OIG that a proposed purchase or proposed acquisition will not be subject to the CIA requirements, Advanced Bionics must notify OIG in writing at least 30 days in advance of the proposed sale or purchase. This notification shall include a description of the business, business unit, or location to be sold or purchased, a brief description of the terms of the transaction and, in the case of a proposed sale, the name and contact information of the prospective purchaser.

## V. IMPLEMENTATION REPORT AND ANNUAL REPORTS

A. Implementation Report. Within 120 days after the Effective Date, Advanced Bionics shall submit a written report (Implementation Report) to OIG that includes, at a minimum, the following information:

1. the name, business address, business phone number, and position description of the Compliance Officer required by Section III.A.1, and a detailed description of any noncompliance job responsibilities;

2. the names and positions of the members of the Compliance Committee required by Section III.A.2;

3. the names of the Board members who are responsible for satisfying the Board compliance requirements described in Section III.A.3;

4. the names and positions of the Certifying Covered Persons required by Section III.A.4 and a copy of the written process for Certifying Covered Persons to follow in order to complete the certification required by Section III.A.4;

5. a list of the Policies and Procedures required by Section III.B;

6. the Training Plan required by Section III.C.1 and a description of the Board training required by Section III.C.2 (including a summary of the topics covered, the length of the training and when the training was provided);

7. the following information regarding the IRO(s): (a) identity, address, and phone number; (b) a copy of the engagement letter; (c) information to demonstrate that the IRO has the qualifications outlined in Appendix A to this CIA; and (d) a certification from the IRO regarding its professional independence and objectivity with respect to Advanced Bionics that includes a summary of all current and prior engagements between Advanced Bionics and the IRO;

8. a description of the risk assessment and internal review process required by Section III.E;

9. a description of the Disclosure Program required by Section III.F;

10. a description of the Ineligible Persons screening and removal process required by Section III.G;

11. a list of all of Advanced Bionics's locations (including mailing addresses); the corresponding name under which each location is doing business; and the locations' Medicare and state Medicaid provider number and/or supplier number(s), if any;

12. a description of Advanced Bionics's corporate structure, including identification of any parent and sister companies, subsidiaries, and their respective lines of business; and

13. a certification by the Compliance Officer and President that:

a. to the best of his or her knowledge, except as otherwise described in the report, Advanced Bionics has implemented and is in compliance with all requirements of this CIA;

b. he or she has reviewed the report and has made reasonable inquiry regarding its content and believes that the information in the report is accurate and truthful; and

c. he or she understands that the certification is being provided to and relied upon by the United States.

B. Annual Reports. Advanced Bionics shall submit a written report (Annual Report) to OIG for each of the five Reporting Periods that includes, at a minimum, the following information:

1. any change in the identity, position description, or noncompliance job responsibilities of the Compliance Officer; a current list of the Compliance Committee members; a current list of the Board members who are responsible for satisfying the Board compliance requirements; and a current list of the Certifying Covered Persons, along with the identification of any changes made during the Reporting Period to the Compliance Committee, Board, or Certifying Covered Persons;

2. the dates of each meeting of the Compliance Committee (copies of the meeting minutes shall be made available to OIG upon request);

3. the dates of each report made by the Compliance Officer to the Board (written documentation of such reports shall be made available to OIG upon request);

4. the Board resolution required by Section III.A.3, a description of the materials reviewed by the Board and any additional steps taken in its oversight of the compliance program and in support of making the resolution;

5. a description of any changes to the written process for Certifying Covered Persons to follow in order to complete the certification required by Section III.A.4;

6. the certifications of Certifying Covered Persons required by Section III.A.4;

7. a list of any new or revised Policies and Procedures required by Section III.B developed during the Reporting Period;

8. a description of any changes to the Training Plan required by Section III.C and a summary of all training furnished to Covered Persons and Board members during the Reporting Period;

9. a complete copy of all reports prepared pursuant to Section III.D and Advanced Bionics' response to the reports, along with corrective action plan(s) related to any issues raised by the reports;

10. a certification from the IRO regarding its professional independence and objectivity with respect to Advanced Bionics, including a summary of all current and prior engagements between Advanced Bionics and the IRO;

11. a description of any changes to the risk assessment and internal review process required by Section III.E, including the reason(s) for such changes;

12. a summary of the following components of the risk assessment and internal review process during the Reporting Period: (a) risk areas identified, (b) work plans and

internal audit plans developed, (b) internal audits performed, (c) corrective action plans developed in response to internal audits, and (d) steps taken to track the implementation of the work plans and any corrective action plans. Copies of any work plans, internal audit reports, and corrective action plans shall be made available to OIG upon request;

13. a summary of the disclosures in the disclosure log required by Section III.F that relate to Federal health care programs, FDA requirements, or Government Reimbursed Products, including at least the following information: (a) a description of the disclosure, (b) the date the disclosure was received, (c) the resolution of the disclosure, and (d) the date the disclosure was resolved. The complete disclosure log shall be made available to OIG upon request;

14. a description of any changes to the Ineligible Persons screening and removal process required by Section III.G, including the reason(s) for such changes;

15. a summary describing any ongoing investigation or legal proceeding required to have been reported pursuant to Section III.H that includes a description of the allegation(s), the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding;

16. a summary of all Reportable Events required to have been reported pursuant to Section III.I during the Reporting Period;

17. a summary describing any written communication with the FDA required to have been reported pursuant to Section III.J that includes a description of each matter and the status of each matter;

18. (in the fourth Annual Report), a copy of the Transition Plan required by Section III.K;

19. a description of all changes to the most recently provided list of Advanced Bionics's locations (including addresses) as required by Section V.A.11;

20. a description of any changes to Advanced Bionics's corporate structure, including any parent and sister companies, subsidiaries, and their respective lines of business; and

21. a certification by the Compliance Officer and President that:

a. to the best of his or her knowledge, except as otherwise described in the report, Advanced Bionics has implemented and is in compliance with all requirements of this CIA;

b. he or she has reviewed the report and has made reasonable inquiry regarding its content and believes that the information in the report is accurate and truthful; and

c. he or she understands that the certification is being provided to and relied upon by the United States.

The first Annual Report shall be received by OIG no later than 60 days after the end of the first Reporting Period. Subsequent Annual Reports shall be received by OIG no later than the anniversary date of the due date of the first Annual Report.

C. Designation of Information. Advanced Bionics shall clearly identify any portions of its submissions that it believes are trade secrets, or information that is commercial or financial and privileged or confidential, and therefore potentially exempt from disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Advanced Bionics shall refrain from identifying any information as exempt from disclosure if that information does not meet the criteria for exemption from disclosure under FOIA.

## VI. NOTIFICATIONS AND SUBMISSION OF REPORTS

Unless otherwise stated in writing after the Effective Date, all notifications and reports required under this CIA shall be submitted using the following contact information:

OIG:

Administrative and Civil Remedies Branch
Office of Counsel to the Inspector General
Office of Inspector General
U.S. Department of Health and Human Services
Cohen Building, Room 5527
330 Independence Avenue, S.W.
Washington, DC 20201
Telephone: 202.619.2078
Email Address: officeofcounsel@oig.hhs.gov

Advanced Bionics:

Dawn Sorensen
Vice President, Global Legal Affairs
28515 Westinghouse Place
Valencia, CA 91355
Telephone: 661.362.1400

Unless otherwise requested by OIG, all notifications and reports required by this CIA shall be submitted electronically. OIG shall notify Advanced Bionics in writing of any changes to the OIG contact information listed above. Advanced Bionics shall notify OIG in writing within two business days of any changes to the Advanced Bionics contact information listed above.

## VII. OIG INSPECTION, AUDIT, AND REVIEW RIGHTS

In addition to any other rights OIG may have by statute, regulation, or contract, OIG or its duly authorized representative(s) may conduct interviews, examine and/or request copies of or copy Advanced Bionics's books, records, and other documents and supporting materials, and conduct on-site reviews of any of Advanced Bionics's locations, for the purpose of evaluating: (a) Advanced Bionics's compliance with the terms of this CIA and (b) Advanced Bionics's compliance with Federal health care program requirements and with all applicable FDA requirements. The documentation described above shall be made available by Advanced Bionics to OIG or its duly authorized representative(s) at all reasonable times for inspection, audit, and/or reproduction. For purposes of this provision, OIG or its duly authorized representative(s) may interview any of Advanced Bionics's owners, employees, contractors and Board members who consent to be interviewed at the individual's place of business during normal business hours or at such other place and time as may be mutually agreed upon between the individual and OIG. Advanced Bionics shall assist OIG or its duly authorized representative(s) in contacting and arranging interviews with such individuals upon OIG's request. Advanced Bionics's owners, employees, contractors and Board members may elect to be interviewed with or without a representative of Advanced Bionics present.

## VIII. DOCUMENT AND RECORD RETENTION

Advanced Bionics shall maintain for inspection all documents and records relating to reimbursement from the Federal health care programs and to compliance with this CIA for six years (or longer if otherwise required by law) from the Effective Date.

## IX. DISCLOSURES

Consistent with HHS's FOIA procedures, set forth in 45 C.F.R. Part 5, OIG shall make a reasonable effort to notify Advanced Bionics prior to any release by OIG of information submitted by Advanced Bionics pursuant to its requirements under this CIA and identified upon submission by Advanced Bionics as trade secrets, or information that is commercial or financial and privileged or confidential, under the FOIA rules. With respect to such releases, Advanced Bionics shall have the rights set forth at 45 C.F.R. § 5.42(a).

## X. BREACH AND DEFAULT PROVISIONS

A. Stipulated Penalties. OIG may assess:

1. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section III.A;

2. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section III.B;

3. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section III.C;

4. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section III.D;

5. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section III.E;

6. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section III.F;

7. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section III.G;

8. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section III.H;

9. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section III.I;

10. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section III.J;

11. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section III.K;

12. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section IV;

13. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section V;

14. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section VII;

15. A Stipulated Penalty of up to $2,500 for each day Advanced Bionics fails to comply with Section VIII; or

16. A Stipulated Penalty of up to $50,000 for each false certification or false statement made to OIG by or on behalf of Advanced Bionics under this CIA.

B. Timely Written Requests for Extensions. Advanced Bionics may, in advance of the due date, submit a timely written request for an extension of time to perform any act or file any notification or report required by this CIA. If OIG grants the timely written request with respect to an act, notification, or report, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until one day after Advanced Bionics fails to meet the revised deadline set by OIG. If OIG denies such a timely written request, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue

until three business days after Advanced Bionics receives OIG's written denial of such request or the original due date, whichever is later. A "timely written request" is defined as a request in writing received by OIG at least five business days prior to the date by which any act is due to be performed or any notification or report is due to be filed.

C. Payment of Stipulated Penalties.

1. *Demand Letter*. If OIG determines that a basis for Stipulated Penalties under Section X.A exists, OIG shall notify Advanced Bionics of: (a) Advanced Bionics's failure to comply and (b) OIG's demand for payment of Stipulated Penalties (this notification is referred to as the "Demand Letter").

2. *Response to Demand Letter.* Within 15 business days after the date of the Demand Letter, Advanced Bionics shall either: (a) pay the applicable Stipulated Penalties or (b) request a hearing before an HHS administrative law judge (ALJ) to dispute OIG's determination of noncompliance, pursuant to the agreed upon provisions set forth below in Section X.E.

3. *Form of Payment*. Payment of the Stipulated Penalties shall be made by electronic funds transfer to an account specified by OIG in the Demand Letter.

D. Exclusion for Material Breach

1. *Definition of Material Breach*. A material breach of this CIA means:

a. failure to comply with any of the requirements of this CIA for which OIG has previously issued a demand for Stipulated Penalties under Section X.C, unless such Stipulated Penalty was overturned by an ALJ on appeal pursuant to the procedures described in Section X.E below;

b. failure to comply with Section III.A.1;

c. failure to comply with Section III.D;

d. failure to comply with Section III.I;

e. failure to comply with Section V;

f. failure to respond to a Demand Letter in accordance with Section X.C;

g. a false statement or false certification made to OIG by or on behalf of Advanced Bionics under this CIA;

h. failure to pay Stipulated Penalties within 20 days after an ALJ issues a decision ordering Advanced Bionics to pay the Stipulated Penalties or within 20 days after the HHS Departmental Appeals

Board (DAB) issues a decision upholding the determination of OIG; or

i. failure to come into compliance with a requirement of this CIA for which OIG has demanded Stipulated Penalties, pursuant to the deadlines listed in Section X.E.2.

2. *Notice of Material Breach and Intent to Exclude*. The parties agree that a material breach of this CIA by Advanced Bionics constitutes an independent basis for Advanced Bionics's exclusion from participation in the Federal health care programs. The length of the exclusion shall be in OIG's discretion, but not more than five years for each material breach. Upon a preliminary determination by OIG that Advanced Bionics has materially breached this CIA, OIG shall notify Advanced Bionics of: (a) Advanced Bionics's material breach and (b) OIG's intent to exclude Advanced Bionics (this notification is hereinafter referred to as the "Notice of Material Breach and Intent to Exclude").

3. *Response to Notice*. Advanced Bionics shall have 30 days from the date of the Notice of Material Breach and Intent to Exclude to submit any information and documentation for OIG to consider before it makes a final determination regarding exclusion.

4. *Exclusion Letter*. If OIG determines that exclusion is warranted, OIG shall notify Advanced Bionics in writing of its determination to exclude Advanced Bionics (this letter shall be referred to hereinafter as the "Exclusion Letter"). Subject to the Dispute Resolution provisions in Section X.E, below, the exclusion shall go into effect 30 days after the date of the Exclusion Letter. The effect of the exclusion shall be that no Federal health care program payment may be made for any items or services furnished, ordered, or prescribed by Advanced Bionics, including administrative and management services, except as stated in regulations found at 42 C.F.R. §1001.1901(c). The exclusion shall have national effect. Reinstatement to program participation is not automatic. At the end of the period of exclusion, Advanced Bionics may apply for reinstatement by submitting a written request for reinstatement in accordance with the provisions at 42 C.F.R. §§ 1001.3001-.3004.

E. Dispute Resolution

1. *Review Rights*. Upon OIG's issuing a Demand Letter or Exclusion Letter, and as an agreed-upon remedy for the resolution of disputes arising under this CIA, Advanced Bionics shall be afforded certain review rights comparable to the ones that are provided in 42 U.S.C. § 1320a-7(f) and 42 C.F.R. Part 1005. Specifically, OIG's determination to demand payment of Stipulated Penalties or to seek exclusion shall be subject to review by an HHS ALJ and, in the event of an appeal, the DAB, in a manner consistent with the provisions in 42 C.F.R. § 1005.2-1005.21, but only to the extent this CIA does not provide otherwise. Notwithstanding the language in 42 C.F.R. § 1005: (a) the request for a hearing involving Stipulated Penalties shall be made within 15 business days after the date of the Demand Letter and the request for a hearing involving exclusion shall be made within 25 days after the date of the Exclusion Letter and (b) no discovery shall be available to the parties. The procedures relating to the filing of a request for a hearing can be found at http://www.hhs.gov/dab/divisions/civil/procedures/divisionprocedures.html.

2. *Stipulated Penalties Review*. Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for Stipulated Penalties under this CIA shall be: (a) whether Advanced Bionics was in full and timely compliance with the requirements of this CIA for which OIG demands payment and (b) the period of noncompliance. Advanced Bionics shall have the burden of proving its full and timely compliance. If the ALJ upholds the OIG's determination that Advanced Bionics has breached this CIA and orders Advanced Bionics to pay Stipulated Penalties, Advanced Bionics must (a) come into compliance with the requirement(s) of this CIA that resulted in the OIG imposing Stipulated Penalties and (b) pay the Stipulated Penalties within 20 days after the ALJ issues a decision, unless Advanced Bionics properly and timely requests review of the ALJ decision by the DAB. If the ALJ decision is properly and timely appealed to the DAB and the DAB upholds the determination of OIG, Advanced Bionics must (a) come into compliance with the requirement(s) of this CIA that resulted in the OIG imposing Stipulated Penalties and (b) pay the Stipulated Penalties within 20 days after the DAB issues its decision.

3. *Exclusion Review*. Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for exclusion based on a material breach of this CIA shall be whether Advanced Bionics was in material breach of this CIA. If the ALJ sustains the OIG's determination of material breach, the exclusion shall take effect 20 days after the ALJ issues the decision. If the DAB finds in favor of OIG after an ALJ decision adverse to OIG, the exclusion shall take effect 20 days after the DAB decision. Advanced Bionics shall waive its right to any notice of such exclusion if a decision upholding the exclusion is rendered by the ALJ or DAB. If the DAB finds in favor of Advanced Bionics, Advanced Bionics shall be reinstated effective on the date of the exclusion.

4. *Finality of Decision.* The review by an ALJ or DAB provided for above shall not be considered to be an appeal right arising under any statutes or regulations. The parties to this CIA agree that the DAB's decision (or the ALJ's decision if not appealed) shall be considered final for all purposes under this CIA and Advanced Bionics agrees not to seek additional review of the DAB's decision (or the ALJ's decision if not appealed) in any judicial forum.

## XI. EFFECTIVE AND BINDING AGREEMENT

Advanced Bionics and OIG agree as follows:

A. This CIA constitutes the complete agreement between the parties and may not be amended except by written consent of the parties to this CIA.

B. All requirements and remedies set forth in this CIA are in addition to and do not affect (1) Advanced Bionics's responsibility to follow all applicable Federal health care program and FDA requirements or (2) the government's right to impose appropriate remedies for failure to follow applicable Federal health care program or FDA requirements.

C. The undersigned Advanced Bionics signatories represent and warrant that they are authorized to execute this CIA. The undersigned OIG signatories represent that they are signing this CIA in their official capacity and that they are authorized to execute this CIA.

D. This CIA may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same CIA. Electronically transmitted copies of signatures shall constitute acceptable, binding signatures for purposes of this CIA.

**ON BEHALF OF ADVANCED BIONICS**

___/Dawn Sorensen/_______________
DAWN SORENSEN
Vice President, Global Legal Affairs
Advanced Bionics LLC

_____12/16/22______________
DATE

___/Matthew J. O'Connor/____________
MATTHEW O'CONNOR
Covington & Burling LLP
Counsel for Advanced Bionics LLC

______12/16/22______________
DATE

**ON BEHALF OF THE OFFICE OF INSPECTOR GENERAL
OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES**

_____/Lisa M. Re/____________________
LISA M. RE
Assistant Inspector General for Legal Affairs
Office of Inspector General
U.S. Department of Health and Human Services

___12/14/2022___________
DATE

_____/Gregory J. Wellins/_______________
GREGORY J. WELLINS
Senior Counsel

____12/19/2022__________
DATE

# APPENDIX A

# INDEPENDENT REVIEW ORGANIZATION

This Appendix contains the requirements relating to the Independent Review Organization (IRO) required by Section III.D of the CIA.

A. <u>IRO Engagement</u>

1. Advanced Bionics shall engage an IRO that possesses the qualifications set forth in Paragraph B, below, to perform the responsibilities in Paragraph C, below. The IRO shall conduct the review in a professionally independent and objective fashion, as set forth in Paragraph E. Within 30 days after OIG receives the information identified in Section V.A.7 of the CIA or any additional information submitted by Advanced Bionics in response to a request by OIG, whichever is later, OIG will notify Advanced Bionics if the IRO is unacceptable. Absent notification from OIG that the IRO is unacceptable, Advanced Bionics may continue to engage the IRO.

2. If Advanced Bionics engages a new IRO during the term of the CIA, that IRO must also meet the requirements of this Appendix. If a new IRO is engaged, Advanced Bionics shall submit the information identified in Section V.A.7 of the CIA to OIG within 30 days of engagement of the IRO. Within 30 days after OIG receives this information or any additional information submitted by Advanced Bionics at the request of OIG, whichever is later, OIG will notify Advanced Bionics if the IRO is unacceptable. Absent notification from OIG that the IRO is unacceptable, Advanced Bionics may continue to engage the IRO.

B. <u>IRO Qualifications</u>

The IRO shall:

1. assign individuals to conduct the Systems Review and Transactions Review who have expertise in the medical device industry and FDA requirements relating to the Covered Functions (as defined in Section II.C of the CIA), including but not limited to expertise relating to the preparation and submission of Premarket Approval Applications (PMAs) to the FDA; and

2. have sufficient staff and resources to conduct the reviews required by the CIA on a timely basis.

C. <u>IRO Responsibilities</u>

The IRO shall:

1. perform each component of the Systems Review and Transactions Review in accordance with the specific requirements of the CIA;

2. follow all applicable FDA requirements in making assessments in the Systems Review and Transactions Review;

3. respond to all OIG inquires in a prompt, objective, and factual manner; and

4. prepare timely, clear, well-written reports that include all the information required by Appendix B to the CIA.

D. Advanced Bionics' Responsibilities

Advanced Bionics shall ensure that the IRO has access to all records and personnel necessary to complete the reviews listed in III.D of this CIA and that all records furnished to the IRO are accurate and complete.

E. IRO Independence and Objectivity

The IRO must perform each component of the Systems Review and Transactions Review in a professionally independent and objective fashion, as defined in the most recent Government Auditing Standards issued by the U.S. Government Accountability Office.

F. IRO Removal/Termination

1. *Advanced Bionics and IRO.* If Advanced Bionics terminates its IRO or if the IRO withdraws from the engagement during the term of the CIA, Advanced Bionics must submit a notice explaining (a) its reasons for termination of the IRO or (b) the IRO's reasons for its withdrawal to OIG, no later than 30 days after termination or withdrawal. Advanced Bionics must engage a new IRO in accordance with Paragraph A of this Appendix and within 60 days of termination or withdrawal of the IRO.

2. *OIG Removal of IRO.* In the event OIG has reason to believe the IRO does not possess the qualifications described in Paragraph B, is not independent and objective as set forth in Paragraph E or has failed to carry out its responsibilities as described in Paragraph C, OIG shall notify Advanced Bionics in writing regarding OIG's basis for determining that the IRO has not met the requirements of this Appendix. Advanced Bionics shall have 30 days from the date of OIG's written notice to provide information regarding the IRO's qualifications, independence or performance of its responsibilities in order to resolve the concerns identified by OIG. If, following OIG's review of any information provided by Advanced Bionics regarding the IRO, OIG determines that the IRO has not met the requirements of this Appendix, OIG shall notify Advanced Bionics in writing that Advanced Bionics shall be required to engage a new IRO in accordance with Paragraph A of this Appendix. Advanced Bionics must engage a new IRO within 60 days of its receipt of OIG's written notice. The final determination as to whether or not to require Advanced Bionics to engage a new IRO shall be made at the sole discretion of OIG.

## APPENDIX B

## INDEPENDENT REVIEW ORGANIZATION REVIEWS

The IRO shall perform a Systems Review and a Transactions Review relating to the Covered Functions (as defined in Section II.C of the CIA). If there are no material changes in Advanced Bionics's systems, processes, policies, and procedures relating to the Covered Functions, the IRO shall perform the Systems Review for the first and fourth Reporting Periods. If Advanced Bionics materially changes its systems, processes, policies, and procedures relating to Covered Functions, the IRO shall perform an additional Systems Review for the Reporting Period(s) in which such changes were made that identifies the material changes and reviews the systems, processes, policies, and procedures that materially changed. The IRO shall conduct the Transactions Review for the second through fifth Reporting Periods of the CIA.

A. Systems Review. For the Systems Review, the IRO shall review Advanced Bionics's systems, processes, policies, and procedures associated with the following (hereafter "Reviewed Policies and Procedures"):

1. Advanced Bionics's organizational structure as it relates to Covered Functions, including the identification of those individuals, departments, or groups within Advanced Bionics responsible for the preparation or submission of PMAs to the FDA and communications with FDA about PMAs and the component elements of PMAs;

2. The systems, processes, policies, and procedures that Advanced Bionics uses or follows in connection with performance standards related to PMAs including:

a. the individuals, departments, or groups authorized to approve the selection of performance standards to be used in connection with a Government Reimbursed Product or to approve policies and procedures relating to performance standards;

b. the information and factors to be considered in connection with the selection of performance standards and the establishment of performance standards policies and procedures; and

c. the types and sources of information (both internal and external) used to make decisions about performance standards.

3. The systems, processes, policies, and procedures that Advanced Bionics uses or follows in connection with testing or evaluating whether Advanced Bionics's Government Reimbursed Products meet performance standards and for justifying or evaluating any deviation from such performance standards; and

4. Advanced Bionics's systems, policies, processes, and procedures relating to disciplinary policies and procedures for violations of Advanced Bionics's Policies and Procedures relating to the Covered Functions.

B. Systems Review Report. The IRO shall prepare a Systems Review Report for each Systems Review that includes the following information:

1. a description of the documentation (including policies) reviewed and any personnel interviewed;

2. a detailed description of Advanced Bionics's systems, policies, processes, and procedures relating to the items identified in Sections A.1-4 above, including a general description of Advanced Bionics's control and accountability systems (e.g., documentation and approval requirements, and tracking mechanisms) and written policies regarding the Reviewed Policies and Procedures;

3. a description of the manner in which the control and accountability systems and the written policies relating to the items identified in Sections A.1-4 above are made known or disseminated within Advanced Bionics;

4. findings and supporting rationale regarding any material differences between published PMA-related performance standards applicable to Government Reimbursed Products and the systems, processes, policies, and procedures relating to the Reviewed Policies and Procedures, if any; and

5. recommendations to improve material compliance with PMA-related performance standards applicable to Government Reimbursed Products and the systems, policies, processes, or procedures relating to the Reviewed Policies and Procedures, if any.

C. Transactions Review. The Transactions Review shall include a review of performance standards applicable to Government Reimbursed Products for which PMAs or supplements to PMAs were submitted to FDA and may also include a review of an Additional Item.

1. *Review of Performance Standards.*

a. For each Reporting Period, the IRO shall review information relating to the performance standards (as referenced in 21 C.F.R. § 814.20(b)(5)) applicable to Government Reimbursed Products included or referenced in PMAs or PMA-related submissions or supplements submitted to FDA during the applicable Reporting Period. The IRO shall conduct this review (Performance Standards Review) by reviewing configurations, results, and descriptions of the performance standards applicable to the Government Reimbursed Product and any results of testing the Government Reimbursed Products against the performance standards. If the PMAs or PMA-related submissions or supplements to be reviewed by the IRO include multiple performance standards referenced by or relied on by Advanced Bionics, or a performance standard has multiple subparts, the IRO or Advanced Bionics may propose to OIG that the IRO review a sample of performance standards or performance standard subparts. Any such proposal must be reviewed and approved in advance by the OIG and such approval shall be in the OIG's discretion.

b. For purposes of conducting its review of performance standards, the IRO shall have access to all records and personnel necessary to complete the review described below. This shall include access to internal Advanced Bionics documents and information relating to: i) the Government Reimbursed Products for which PMAs or PMA-related submissions or supplements were submitted to FDA during the applicable Reporting Period, ii) performance standards applicable to each of the Government Reimbursed Products; iii) test reports evaluating the Government Reimbursed Products against the performance standards; and iv) descriptions of performance standard test reports for the Government Reimbursed Products intended for submission to the FDA.

c. For each Government Reimbursed Product reviewed the IRO shall:

i. identify the configurations, results, and descriptions of tests of the Government Reimbursed Product against the applicable performance standards during the Reporting Period;

ii. evaluate whether the testing was conducted in a manner consistent with Advanced Bionics's Policies and Procedures relating to Covered Functions, including whether all required approvals were obtained, whether the decision-making process was consistent with Advanced Bionics's Policies and Procedures, and whether all required documentation pertaining to performance standards testing was retained; and

iii. verifying that the documentation pertaining to performance standards testing maintained by Advanced Bionics is consistent with the documentation of performance standards testing submitted to the FDA.

2. *Review of Additional Item*. As set forth in Section III.D of the CIA, for each Reporting Period, the OIG at its discretion may identify an additional item for the IRO to review (hereafter "Additional Item").

a. No later than 120 days prior to the end of the applicable Reporting Period, the OIG shall notify Advanced Bionics of the nature and scope of the IRO review to be conducted for the Additional Item. Prior to undertaking the review of the Additional Item, the IRO and/or Advanced Bionics shall submit an audit work plan to the OIG for approval and the IRO shall conduct the review of the Additional Item based on a work plan approved by the OIG. The IRO shall include information about its review of the Additional Item in the Transactions Review Report (including a description of the review conducted; the IRO's findings based on its review; and the IRO's recommendations for any changes in Advanced Bionics's systems, policies, and procedures based on its review).

b. Advanced Bionics may propose to the OIG that its internal audit(s), reviews, or monitoring activities, be substituted, for the Additional Item that would otherwise be reviewed by the IRO for the applicable Reporting Period. The OIG retains sole discretion over whether, and in what manner, to allow Advanced Bionics's internal audit work to be substituted for the Additional Item review conducted by the IRO.

D. Transactions Review Report. The IRO shall prepare a Transactions Review Report for each Transactions Review that includes the following information:

1. *Transactions Review Methodology.*

a. Review Objective: A statement of the objective intended to be achieved by each part of the Transactions Review;

b. Review Protocol: A detailed narrative description of how the Transactions Review was performed and what was evaluated; and

c. Sources of Data: A description of the documentation and other information relied on by the IRO in performing the Transactions Review.

2. *Transactions Review Findings.*

a. Relating to the Review of Performance Standards. The following results shall be included in each Transaction Review Report:

i. a description of each Government Reimbursed Product reviewed, including the name of the product, a description of the product (including the approved indications for the product), and a description of when Advanced Bionics began to sell the product;

ii. for each Government Reimbursed Product, a description of the performance standards applicable to the product during the Reporting Period;

iii. for each Government Reimbursed Product, a description of the testing against the applicable performance standard that was conducted by Advanced Bionics and submitted to FDA for the product during the Reporting Period;

iv. the IRO's findings and supporting rationale as to:

(a) whether the performance standard testing was conducted in a manner consistent with Advanced Bionics's Policies and Procedures relating to Covered Functions, including whether all required approvals were obtained, whether the

decision-making process was consistent with Advanced Bionics's Policies and Procedures, and whether all required documentation pertaining to performance standard testing decisions was retained;

(b) whether the documentation pertaining to performance standards testing maintained by Advanced Bionics is consistent with the documentation of performance standards testing submitted to the FDA;

(c) if the performance standard testing was not conducted for the Government Reimbursed Product in a manner consistent with Advanced Bionics's Policies and Procedures, the IRO's findings about Advanced Bionics's deviations from those Policies;

(d) if the documentation pertaining to performance standards testing maintained by Advanced Bionics is not consistent with the documentation of performance standards testing submitted to the FDA, the IRO's findings relating to such inconsistencies;

(e) whether the IRO identified any weaknesses in Advanced Bionics's systems, processes, policies, procedures and/or practices relating to Covered Functions; and

(f) whether the IRO has recommendations for improvements to Advanced Bionics's systems, processes, policies, procedures and/or practices relating to Covered Functions.

b. Relating to the Review of Additional Item

i. a description of the review conducted;

ii. the IRO's findings based on its review;

iii. the IRO's findings and supporting rationale regarding any weaknesses in Advanced Bionics's systems, processes, policies, procedures, and practices relating to the Additional Item, if any; and

iv. the IRO's recommendations, if any, for changes in Advanced Bionics's systems, processes, policies, and procedures that would correct or address any weaknesses or deficiencies uncovered during the review.